SOUTHWESTERN TELEGRAPH & TELE-
PHONE CO. v. CITY OF DALLAS.†
(No. 7231.)

(Court of Civil Appeals of Texas. Dallas.
Jan. 16, 1915. Rehearing Denied
March 6, 1915.)

1. CONSTITUTIONAL LAW ⬤➡101, 134—VEST-
ED RIGHTS—OBLIGATION OF CONTRACTS.

Under Const. art. 1, § 17, declaring that no
irrevocable or uncontrollable grant of special
privileges shall be made, but all privileges and
franchises granted by the Legislature, or creat-
ed under its authority, shall be subject to its
control, the Legislature cannot grant, and so
cannot authorize a city to grant, to a telephone
company the right to use streets of the city for
its poles free from future regulation and con-
trol; so that, though the company has paid the
city for entering thereon, no vested rights are
disturbed or obligation of contracts impaired
by a subsequent ordinance requiring annual
payment of a certain amount per pole for main-
taining its poles on the streets.

[Ed. Note.—For other cases, see Constitution-
al Law, Cent. Dig. §§ 209–211, 344; Dec. Dig.
⬤➡101, 134.]

2. LICENSES ⬤➡ 5½—POWER OF CITY—TELE-
PHONE POLES.

A municipality, being a creature of the
state, may exercise only such powers as the state
expressly confers on it, or are necessarily or
fairly implied or incident to the express powers,
and those essential to the declared objects and
purposes of the corporation; hence the mere
fact that a telephone company is unlawfully on
its streets will not, in the absence of an ex-
press, implied, or incidental power, give it right
to require the company to pay for maintain-
ing its poles there.

[Ed. Note.—For other cases, see Licenses,
Dec. Dig. ⬤➡5½.]

3. LICENSES ⬤➡6 — POWER OF CITY — TELE-
PHONE POLES—"REGULATE"—"USE."

The power given a city by its charter to
regulate the use of its streets and to remove
therefrom telephone poles includes authority
to charge a telephone company for use and oc-
cupation, of its streets with poles; "regulate"
meaning to control, direct, govern, and lay down
the rule by which a thing shall be done, and
"use" meaning to make use of, to convert to
one's own service, to put to a purpose, to hold,
occupy, enjoy, or take the benefit of.

[Ed. Note.—For other cases, see Licenses,
Cent. Dig. §§ 5, 6, 19; Dec. Dig. ⬤➡6.

For other definitions, see Words and Phrases,
First and Second Series, Regulate; Use.]

4. CONSTITUTIONAL LAW ⬤➡230—EQUAL PRO-
TECTION OF LAWS—PAYMENTS ON POLES IN
STREETS.

The equal protection of the laws is not de-
nied in violation of Const. art. 1, § 3, and
Const. U. S. art. 14, § 1, by an ordinance re-
quiring all using or maintaining poles in the
streets to pay an annual privilege fee of $2 per
pole, but excepting poles of street car compa-
nies and of companies which by their franchis-
es are required to pay the city a percentage of
the receipts of their business, the classification
being reasonable and just, in view of the small-
er amount which those required to make such
payment are otherwise required to contribute for
the use of the streets.

[Ed. Note.—For other cases, see Constitution-
al Law, Cent. Dig. § 687; Dec. Dig. ⬤➡230.]

5. LICENSES ⬤➡7—UNIFORMITY OF TAX—PRIV-
ILEGE FEE.

Const. art. 8, § 1, providing for equal and
uniform taxation of all, is not violated by an

ordinance requiring certain of the companies
maintaining poles in the streets to pay an an-
nual privilege fee therefor.

[Ed. Note.—For other cases, see Licenses,
Cent. Dig. §§ 7–15, 19; Dec. Dig. ⬤➡7.]

6. TELEGRAPHS AND TELEPHONES ⬤➡30—
PRIVILEGE TAX ON POLES—LONG-DISTANCE
POLES.

Even if the poles of telephone company in
a city's streets used for its long-distance wires
cannot be subjected by the city to the payment
of a privilege fee, yet in an action by the city
to collect the annual fee of $2 per pole, imposed
by ordinance on all poles in the street, the com-
pany must, by proper evidence, make known the
number of its poles so used, that they may be
excepted, particularly as they are inconsiderable
compared with those used for local business.

[Ed. Note.—For other cases, see Telegraphs
and Telephones, Cent. Dig. § 19; Dec. Dig. ⬤➡
30.]

7. LICENSES ⬤➡7—REASONABLENESS — POLES
IN STREETS.

A fee of $2 per pole per year, imposed by
an ordinance for maintaining telephone poles in
streets, cannot be said, as a matter of law, to
be unreasonable.

[Ed. Note.—For other cases, see Licenses,
Cent. Dig. §§ 7–15, 19; Dec. Dig. ⬤➡7.]

Appeal from District Court, Dallas Coun-
ty; Kenneth Foree, Judge.

Action by the City of Dallas against the
Southwestern Telegraph & Telephone Com-
pany, to recover an annual privilege fee on
poles in its streets. Judgment for plaintiff,
and defendant appeals. Affirmed.

A. P. Wozencraft, W. S. Bramlett, and S.
P. English, all of Dallas, for appellant.
Horace Chilton and Chas. F. O'Donnell, both
of Dallas, for appellee.

RASBURY, J. On February 5, 1913, ap-
pellee, a municipal corporation, operating
and conducting its affairs by authority of
special legislative grant, enacted the fol-
lowing ordinance, to wit:

"An ordinance to fix amounts required to be
paid by telegraph, telephone and electric com-
panies for the privileges of using, with their
poles, wires and conduits, the streets and al-
leys within the city of Dallas.

"Be it ordained by the board of commissioners
of the city of Dallas:

"Section 1. That all persons and corporations
using or maintaining any telegraph, telephone,
electric light or other poles in any of the streets,
highways, alleys, parks or public places within
the city of Dallas, shall annually, on the 10th
day of March in each and every year, file with
the city secretary a sworn report containing a
list of all such poles so used, possessed or
maintained by him or them, giving the accurate
location of each of said poles, and the number
and character of the wires carried thereon, the
names of the owners of said poles and of the
persons using the same. And every such person
or corporation owning or using any wire or
wires run in conduits beneath the surface of
the streets, highways, alleys, parks or public
places within the city of Dallas, shall include
in said sworn report a statement as to the num-
ber and length of the wires then owned or used
by him or it and run in said underground con-
duits.

"Sec. 2. The board of commissioners may,
when it may see fit, have the books and records
of the person or corporation rendering the state-

ment required in section 1 of this ordinance, examined by a bookkeeper employed by the city to ascertain whether such statement is accurate, but nothing in this ordinance shall be construed to prevent the city from ascertaining the facts by any other method.

"Sec. 3. That on the 15th day of March, 1913, and thereafter annually on the 15th day of March, every person or corporation occupying or using the streets, highways, alleys, parks or public places in the city of Dallas with poles, shall, as a condition to such further occupancy, pay to the city annually for such privileges, a sum equal to two dollars per pole for each and every telegraph, telephone, electric light or other pole, used, possessed or maintained by them respectively on any of said streets, highways, alleys, parks or public places whether such corporation be the owner of such poles or not, except trolley poles used exclusively for stringing thereon wires for use in the propulsion by electricity of street railway passenger cars. And this privilege fee shall be paid on all poles now erected as well as those hereafter erected.

"Sec. 4. That upon receipt of the above fee by the city, the assessor and collector of taxes shall deliver to the person or corporation paying the same, a tin plate with a plain, conspicuous number thereon, to be provided in the manner prescribed in the next succeeding section, for each and every pole upon which said privilege fee is paid, and shall also enter in a book, to be kept for that purpose, the name of the person or corporation to whom the license is issued, and the number of poles for which it is issued and the number of the tin plates delivered to the person paying such privilege fee. He shall also deliver to the person or corporation a certificate under his hand, that such person or corporation has paid the required fee for that year on the specific number of poles, and has received the tin plates of the given number therefor. Such person or corporation shall then have one of such tin plates securely fastened in some conspicuous place upon each of the poles, used, possessed or maintained by him or it, as may be designated by the city electrician.

"Sec. 5. That it shall be the duty of the assessor and collector of taxes annually to purchase a sufficient number of tin plates, numbered with plain conspicuous figures, beginning with number one and so on progressively, to be furnished as prescribed in the next preceding section of this ordinance, and said assessor and collector of taxes shall cause to be stamped with a proper die or painted on each of such tin plates, the year in which they are issued, the said plates to be of suitable size and description in the discretion of the said city assessor and collector of taxes.

"Sec. 6. That every such person, firm or corporation described in section 3 hereof, owning or using any telegraph, telephone, electric light or other wires run in conduits beneath the surface of the streets, alleys, highways or public grounds, within the city of Dallas, shall for such privilege pay to the city on the 15th day of March, 1913, and thereafter annually on the 15th day of March a sum equal to twenty-five cents per wire per mile on each wire as owned or used by said person or corporation.

"Sec. 7. That the superintendent of the police and fire alarm system and the city electrician, shall each have power, and it shall be their duty to examine and inspect from time to time all poles and every wire or cable in the streets, alleys, highways or public places within the city of Dallas, when such wire is designed to carry an electric current and shall notify the person or corporation owning or using said poles when any such pole is unsafe or owning or operating any such wire or cable whenever its attachments, insulation, supports or appliances are unsuitable or unsafe, and that the said poles, wires or cables must be properly replaced, re-

newed, altered or constructed, and shall require the owner of any pole or wire abandoned for use to remove the same.

"Sec. 8. That the charges for the privilege of using the streets, alleys, highways and public places in the city of Dallas provided for in this ordinance, shall not be held to apply to any person or corporation holding a franchise granted under the present city charter and obligated to pay to the city as therein provided, a percentage on the gross receipts of the business pursued by the holder of such franchise.

"Sec. 9. That nothing in this ordinance shall be construed or understood as granting any privilege or authority for any other term than that already vested in persons or corporations now using and occupying the streets, alleys and public places of the city.

"Sec. 10. The charges fixed by this ordinance shall be exclusive of and additional to all ad valorem and franchise taxes, and to all taxes of every nature whatsoever against the persons or corporations mentioned herein. Nothing herein is intended to relieve any such person or corporation of any condition, restriction or requirement imposed by the ordinance, in which it has been authorized to place in the streets, highways, alleys or public places of the city its conduits, poles, wires or other apparatus or imposed by other ordinance heretofore enacted by the city of Dallas, except that former ordinances making charges in the nature of fees for license or privilege for the use of the streets and alleys, against any particular telegraph, telephone or electric light company shall be held superseded by the fees provided for in this ordinance.

"Sec. 11. The city of Dallas hereby reserves the right to put at any time, other restrictions and regulations as to the erection and maintenance of said poles, wires and other apparatus used in connection with the transmission of electricity and from time to time to require such poles as it may deem proper to be removed, and the wires thereon to be run in conduits upon such terms as the city may deem proper.

"Sec. 12. None of the obligations, burdens and restrictions of the ordinance shall in any manner interfere with or destroy the rights and privileges secured to telegraph companies which have accepted the provisions of the act of Congress of July 24, 1866.

"Sec. 13. That every person and corporation and the local manager or agent of every such corporation failing or refusing to make the report required by section 1 of this ordinance or failing or refusing to allow the examination provided for in section 2 hereof, shall, upon conviction in the corporation court of the city of Dallas, be fined in the sum of two hundred dollars, and every day's failure or refusal as mentioned in the section shall be deemed a separate offense.

"Sec. 14. That this ordinance shall take effect from and after its passage as in the city charter in such cases made and provided."

Subsequent to the enactment of the foregoing ordinance appellee sued appellant in the court below, alleging that appellant owned and operated a local telephone exchange in the city of Dallas in connection with which and as a part of its equipment it owned and had upon the streets, alleys, highways, and other public places within said city on March 15, 1913, 7,674 poles and in conduits beneath the streets, alleys, etc., of said city, 45,540 miles of wire, and that the charge of $2 per pole and 25 cents for each mile of underground wire levied by said ordinance was a reasonable charge as a license fee for the care and inspection by appellee of appellant's

poles, wires, conduits, and other fixtures, and alternately that said charge levied by said ordinance was a reasonable charge and just compensation for the use and occupancy of appellee's streets, etc., by appellant's poles and wires, and sought judgment accordingly. Much additional matter was included in the pleading of appellee, notably the claim that appellant is without a franchise, and hence unlawfully upon appellee's streets, etc. Appellant answered by general demurrer, special exceptions, and a denial under oath of the material allegations of appellee's petition, and specially pleaded that appellee was without authority to require appellant to pay reasonable and just compensation for using and occupying appellee's streets, for the reason that such compensation had in fact been paid at the time it established its exchange in the city of Dallas and at the several subsequent times when such exchange or its lines were extended and enlarged, and under which allegations of fact it urged the claim of vested rights, as well as the claim of contract rights sought to be impaired by said ordinance. There was a jury trial upon special issues, followed by judgment for appellee for the amount of the charge levied against the poles, and in favor of appellant for the mileage charge levied against the wires in conduits beneath the street.

We avoid the necessity of a long and profitless statement of the facts, proved and sought to be proved by each side, by stating only those essential to be considered from the view we take of the law of the case. Appellant's predecessor in the telephone business in the city of Dallas was an Arkansas corporation, known as the Southwestern Bell Telephone Company. On April 1, 1881, the city of Dallas, appellee, granted said company permission to erect poles upon its streets and alleys, in order that said company might operate and maintain a telephone exchange therein. Promptly after such permission said company erected its poles and lines and exchange, and operated the latter in the city, reconstructing and extending same as its business required. For such permission or privilege said company paid nothing. On May 25, 1883, said company parted with all its property and rights in the city of Dallas to Southwestern Telegraph & Telephone Company of New York. Said second company took over the affairs of the first company without in any manner compensating the city of Dallas therefor, and maintained and operated same in the city until October 1, 1884, at which time said second company sold and conveyed its property and rights in the city of Dallas to the Erie Telegraph & Telephone Company. This latter and third owner of the telephone business in the city of Dallas paid nothing to the city as compensation for the privilege of transacting its business in the city. On December 30, 1887, the city of Dallas, appellee, enacted an ordinance pertaining to telephone, telegraph, and electric light companies, providing, among other things, that all companies desiring to erect poles under said ordinance should accept the terms of the ordinance in writing, and at the same time also agree in writing that the city might use and occupy the top cross-arm of any pole erected thereunder for telegraph police call or fire alarm purposes free of charge. On May 22, 1889, the Erie Telegraph & Telephone Company accepted in writing the terms of said ordinance, and agreed in like manner that the city might use its top cross-arm free of charge for the purposes stated. On September 7, 1889, the Erie Company sold its property and rights in the city of Dallas to the Southwestern Telegraph & Telephone Company of New York, the fourth and present owner of said telephone business. Said last company on February 10, 1890, notified appellee of such succession and bound itself to the terms of said ordinance of December 30, 1887, in the manner therein directed. We are unable to find anything in the facts in reference to pole permits after appellee's acceptance of February 10, 1890, and we proceed on the assumption that thereafter all extensions, if any, were made under authority of the ordinance of December 30, 1887. On January 25, 1898, however, in connection with some controversy, evidently in progress between the appellee and appellant, the appellant proposed by written communication and in the interest of harmony to furnish appellee the use of 13 additional telephones free of charge, making a total of 20 free telephones in consideration that appellee would grant appellant the right to extend its service to the then unoccupied portions of the city. Appellee accepted the proposition. So far as the record here shows, appellant is yet acting under the permission granted on January 25, 1898, so far as relates to permission to erect poles. Many permissions or ordinances granting the right to place its wires in conduits beneath the streets are shown by the record, but such details are unnecessary to relate so far as pertains to this appeal, for the reason that the jury found against the reasonableness of the charge levied by the ordinance against the underground wires. We here also record the fact, though we believe it to be immaterial, that appellant spent large sums of money in extending its service under the several permits granted it by appellee, and has at all times permitted the use of the top cross-arm of its poles by appellee, and furnished the free telephones which it agreed to furnish, including others, the appellee at the time of trial having the use of 33 telephones free and the use of 96 at half rate. On August 1, 1891, the city of Oak Cliff, a municipal corporation which prior to the institution of the instant case was annexed to and made a part of the city of Dallas, enacted an ordinance permitting appellant to place its telephone poles along its streets, alleys, etc., for the purpose of supplying the citizens of Oak Cliff with telephone service, on terms not disputed by

either side to the controversy, save and except that appellant maintained in the court below that the ordinance granted a franchise indeterminate in point of time, while appellee claimed same was for the term of 15 years, each adducing testimony in support of their respective claims. The jury did not pass upon the precise question, nor was it submitted to them, but we think that fact in no way affects the issues involved in the case. The charges levied by the ordinance under discussion were also against appellant's equipment in the former municipality of Oak Cliff. The foregoing we conceive to be a sufficient statement of the facts, at least at this point in the opinion. We will, in the progress of the opinion, relate any further facts deemed necessary in disposing of particular issues. Nor shall we attempt to discuss the assignments seriatim, but in lieu thereof will discuss the issues as such and in the order in which they arise at law.

[1] First in order of consideration is appellant's claim of vested right in and upon the streets, etc., of the city of Dallas, arising upon the claim that appellant, at the time of its original entry into the city and at the time of each extension of its business, paid or agreed to pay an annual or other consideration for such privilege, and is now observing such agreement, and upon which facts is based the further defense at law that the pole charge impairs the contracts so made with the appellee. Conceding, for the purpose of the discussion only, that from the inauguration of the telephone business in the city of Dallas by appellant's predecessor in title there has been an exact agreement with appellee for the original entry and each extension thereof, upon faith of which appellant has either expended large sums of money or paid some considerable money in the nature of a bonus or both, such facts are, in our opinion, immaterial and do not affect the right of appellee to levy and collect the charge, if it is shown to be a reasonable one. The Legislature is without authority, under the provisions of the present Constitution of this state, and which was the existing Constitution at the time appellant and its predecessor entered the city of Dallas, to grant or confer upon municipalities the right to grant any irrevocable or uncontrollable special privilege. On the contrary, the right to control all grants of special privileges is specially retained in the Legislature by the Constitution, and may not be expressly or impliedly waived, either by the Legislature or by municipalities upon whom the Legislature has conferred its legislative authority over a limited area. Article 1, § 17, Const. Notwithstanding the plain and unambiguous language of the constitutional provision, controversy has arisen relative to its meaning. However, the provision has been construed by the Courts of Civil Appeals and Supreme Court of this state and by the Supreme Court of the United States in such manner that its

meaning can now be safely and fairly said to be no longer an open question. We digress at this point, however, to say that, as we understand the issue we are now discussing, it does not involve the question of whether appellant, under the evidence in the record, has or has not an existing franchise, nor whether appellant's right to the use of the streets of the city under the various permissions, ordinances, etc., may be forfeited for cause, since ouster in the court below was not a remedy sought, and such remedy besides would have been inconsistent with a proceeding to collect a charge levied for the use and occupancy of the streets. Hence we decide neither question, and are not to be understood as expressing any opinion on those issues, notwithstanding much is said by counsel on both sides thereon. We fail to see under any phase of the instant case how such issues can arise. As said in the outset, under the issue we are now considering, can appellant urge its vested right, or the fact that it paid an agreed and sufficient sum for its original entry into the city and each subsequent extension of its business, as a barrier against the charge levied by the ordinance quoted? We conclude it cannot, for the reason, also stated, that the city was without authority to grant appellant any character of permit or franchise which would deny the right of control by succeeding city governments. While much could be said of the wisdom of the rule that denies the governing authorities of to-day the right of bartering away that which may be essential, vital, and necessary to the growing and expanding community of to-morrow, yet a discussion of the wisdom and reason of the rule is superfluous, since the Constitution reserves such control to the Legislature and it becomes with us not a policy but a constitutional command; and as a consequence the Legislature was powerless to confer upon appellee, and appellee powerless to confer upon appellant, the right to use its streets free of the future right of the city to levy a reasonable charge for the use and occupancy thereof. San Antonio Traction Co. v. Altgelt, 81 S. W. 106, was a suit resisting an ordinance based upon the legislative act of April 10, 1903, requiring street railways to transport school children over their lines at half rates, on the ground that the city, by franchise or permit, had agreed that appellant might charge five cent fares, and that such right was a vested one. In disposing of the case against appellant railway company, the court observed:

"It not being shown that appellant was incorporated prior to the time the Constitution of 1876 went into effect, it must be considered to have taken its charter, and all the provisions it contains, subject to the general law of the state and of such changes as may be made in such general law, and subject to future constitutional provisions and future legislation."

The court further remarked, in referring to the right of the city, when authorized by

the Legislature, to control and regulate such utilities, that:

"This right, under the present Constitution, cannot, as we have seen, be relinquished by a provision in the company's charter."

The case from which we have just quoted in time reached the Supreme Court of the United States (San Antonio Traction Co. v. Altgelt, 200 U. S. 304, 26 Sup. Ct. 261, 50 L. Ed. 491), and that court, in also disposing of the case against the contention of the railway company, said:

"Assuming, but not deciding, that the ordinance of March 16, 1899, extending the franchise of the San Antonio Street Railway, and imposing certain limitations, constituted a contract pro tanto, the question still remains whether the provision 'that said street railway companies shall charge five cents fare for one continuous ride over any one of their lines, with one transfer to or from either line to the other,' constituted a contract with respect to which no further legislation upon that subject could be enacted without impairing its obligation. Even if construed as a contract, it was still subject to the provision of the Constitution of 1876, which in section 17 of the Bill of Rights declared that no irrevocable or uncontrollable grant of special privileges should be made, but that all privileges granted by the Legislature or created under its authority shall be subject to the control thereof. An important consideration in this connection is that the alleged contract was made 23 years after the Constitution of 1876 was adopted, declaring that all privileges granted by the Legislature shall be subject to its control. Clearly it was not deprived of that control by the fact that the contract was not entered into by the Legislature itself, but by a municipal corporation, since that is but an agency of the state to which is delegated the power to regulate street railways and other municipal franchises."

Our Supreme Court in Storrie v. Street Railway Co., 92 Tex. 129, 46 S. W. 796, 44 L. R. A. 716, in passing upon a similar question, says, in the light of the constitutional provisions already quoted, that "the Legislature had the right to enact the law of 1891 amending the charter of Houston by which the liability of the street car company for the cost of paving the street was enlarged," and cites approvingly from Railway Co. v. Sioux City, 138 U. S. 98, 11 Sup. Ct. 226, 34 L. Ed. 898, that:

"The company took its franchise subject to such legislation as the state might enact. * * * It was not in the power of the city, by any contract with the company, to deprive the Legislature of the power of taxing the company. * * * Under * * * the Iowa Code, the Legislature had the power, not only to repeal and amend the articles of incorporation of the company, but to impose any conditions upon the enjoyment of its franchise which the General Assembly might deem necessary for the public good. The reservation of this power was a condition of the grant. The city council could make no arrangement with the company which would not be subject, under that section, to the superior power of the General Assembly. * * * No question can arise as to the impairment of the obligation of a contract, when the company accepted all of its corporate powers subject to the reserve power of the state to modify its charter and to impose additional burdens upon the enjoyment of its franchise."

See, also, MacDonell v. Railway Co:, 60 Tex. 591; Waterbury v. City of Laredo, 68 Tex. 576, 5 S. W. 81; City of Corpus Christi v. Central Wharf & Warehouse Co., 8 Tex. Civ. App. 94, 27 S. W. 803; City of Joseph v. Joseph Waterworks Co., 57 Or. 586, 111 Pac. 864, 112 Pac. 1083; Pennsylvania Railroad Co. v. Miller, 132 U. S. 75, 10 Sup. Ct. 34, 33 L. Ed. 267. Thus it is clear that when the Legislature of this state confers upon any municipality the right of local self-government, it can only confer those powers not forbidden by the Constitution, and if the appellee did in fact, under the testimony, intend at the time of the original entry of appellant's predecessor and at the several times subsequent thereto, when it permitted appellant to enlarge its equipment, extend its poles, etc., to confer such right free from future regulation and control by the appellee, such intention is wholly ineffective and immaterial, for the reason that the city was without such authority, even though the Legislature attempted to confer the authority by its charter, since the Legislature itself was incapable of so doing, and as a consequence appellant having acquired all its rights since the adoption of the Constitution of 1876, its vested rights were not disturbed, nor the obligation of its contracts impaired because written into all such rights and contracts by force of the Constitution itself was the further provision that appellee reserved the right of future control and regulation.

[2, 3] In due order we come then to the further issue raised by appellant, whereby it is asserted that, conceding the right of control and regulation in the Legislature with the right to confer such authority upon the city, yet the city had no authority to enact the ordinance levying the charges sued for, because the grant of powers to the city contained in the city's special charter did not authorize such a charge. In pursuing the inquiry thus raised we proceed in the light of the well-settled rule that municipalities, being creatures of the state and existing by the sovereign will and pleasure, possess only such powers as the state confers upon them, with the right of addition or diminution at the state's supreme discretion, and that they may exercise only powers expressly conferred, those necessarily or fairly implied in or incident to the express powers, and those essential to the declared objects and purposes of the corporation. Brenham v. Water Co., 67 Tex. 542, 4 S. W. 143; Southwestern Telegraph & Telephone Co. v. City of Dallas, 104 Tex. 114, 134 S. W. 321; 28 Cyc. 258, B, Powers. With the rule just stated in mind, did appellee's charter authorize it to levy the charge? Counsel for appellee argues that the power exists because appellant's franchise has expired. We do not believe the contention sound. The right to grant and the right to forfeit franchises might be one of the express powers conferred by the Legislature, while the right to charge such con-

cerns as appellant for the use and occupancy of the streets might be omitted from or denied by the Legislature in the special grant. Such omission or denial might result, as we have said, from omission or intentional denial, but such right must be conferred by the grant under the rules stated before it may be exercised. Because appellant is unlawfully upon the streets, if it is, will not, in the absence of express, implied, or incidental power, on the part of appellee, create the right to levy the charge. Such rule would be anomalous, since it would hold the appellant lawfully upon the streets for the purpose of the charge, but unlawfully thereon for the purpose of authorizing the charge. So that we conclude, as indicated at another place, that the question of franchise vel non is immaterial in this proceeding, since it can in no respect affect the right to make the charge or furnish any reason or excuse therefor. But we conclude, however, that the city possesses ample power under its present charter to make the charge for the use and occupancy of the streets, and that such power is expressly conferred by force and virtue of article 2, § 7, cl. 4, of appellee's charter. Said provision, among other things, confers upon appellee express power to lay out, establish, alter, care for, supervise, vacate, close, and regulate the use of its streets, alleys, sidewalks, squares, parks, public places, and to remove therefrom obstructions, telegraph, telephone, and street railway or other poles and encroachments of every other kind thereon. We can hardly conceive of wider authority than is conferred by the provisions quoted. Nothing is lacking in complete dominion. To vacate, close, remove obstructions, such as telephone poles therefrom, to supervise and regulate the use thereof, is broad enough to meet every species of change or rearrangement necessary and fair to all peoples and interests, and clearly includes the right to charge public untility concerns such as appellant, for the use and occupancy thereof. The exact question has been determined by the Supreme Court of the United States. That court in St. Louis v. Western Union Telegraph Co., 149 U. S. 465, 13 Sup. Ct. 990, 37 L. Ed. 810, says:

"Control over the streets resides somewhere. As the legislative power of a state is vested in the Legislature, generally that body has the supreme control, and it delegates to municipal corporations such measure thereof as it deems best. * * * An examination of this charter (that of St. Louis) will disclose that very large and general powers are given to the city, but it would unnecessarily prolong this opinion to quote the many sections defining these powers. It must suffice to notice those directly in point. Paragraph 2 of section 26 of article 3 gives the mayor and assembly power, by ordinance, 'to establish, open, vacate, alter, widen, extend, pave or otherwise improve and sprinkle all streets, avenues, sidewalks, alleys, wharves, and public grounds and squares, * * * and to regulate the use thereof. * * *' Obviously the intent and scope of this charter are to vest in the city a very enlarged control over public property and property devoted to public uses within the territorial limits. It is given power to open and establish streets, to improve them as it sees fit, and to regulate their use. * * * The word 'regulate' is one of broad import. It is the word used in the federal Constitution to define the power of Congress over foreign and interstate commerce, and he who reads the many opinions of this court will perceive how broad and comprehensive it has been held to be. If the city gives a right to the use of the streets or public grounds, as it did by ordinance No. 11604, it simply regulates the use when it prescribes the terms and conditions upon which they shall be used. If it should see fit to construct an expensive boulevard in the city, and then limit the use to vehicles of a certain kind or exact a toll from all who use it, would that be other than a regulation of the use? And so it is only a matter of regulation of use when the city grants to the telegraph company the right to use exclusively a portion of the street, on condition of contributing something towards the expense it has been to in opening and improving the street. Unless, therefore, the telegraph company has some superior right which excludes it from subjection to this control on the part of the city over the streets, it would seem that the power to require payment of some reasonable sum for the exclusive use of a portion of the streets was within the grant of power to regulate the use. * * * The determination of the amount to be paid for the use is as much a matter of regulation as determining the place which may be used, or the size or height of the poles."

In City of Memphis v. Postal Telegraph Co., 145 Fed. 602, 76 C. C. A. 292, it is said that a' provision in the charter of the city of Memphis that it should have "entire control" of its streets conferred authority to demand and receive compensation for the use of its streets by a telegraph company for the erection of poles and wires. The provisions of the charter of appellee do not contain the general term, "entire control," but what is more persuasive of the intention of the Legislature that it should have entire control contains every specific provision with reference to entire control possible to be comprehended within that expression. "Regulate" is said to mean to control, restrict, direct, govern, to lay down the rule by which a thing shall be done. 34 Cyc. 1029. "Use" means to make use of; to convert to one's own service; to put to a purpose; to hold, occupy, enjoy, or take the benefit of. 39 Cyc. 846.

In view of the foregoing we conclude that by article 2, § 3, cl. 35, of appellee's charter, the Legislature conferred ample authority for the powers sought to be exercised under the ordinance levying the charges sued for in the instant claim, and that the contention that it did not possess such power affords no defense to the suit.

[4, 5] It is next urged by appellant that the provisions of the ordinance are in violation of section 3, art. 1, of our Constitution, because discriminatory, and hence denies to appellant equal protection of the laws, and is in violation of section 1, art. 8, of our Constitution providing for equal and uniform taxation of citizens of the state and in viola-

tion of section 1, art. 14, of the federal Constitution, guaranteeing to citizens of all the states equal protection of the laws. The claim that the ordinance denies appellant equal protection of the laws is based upon the provisions of the ordinance which exempt from the pole charge persons or corporations owning poles used exclusively for stringing wires thereon for use in the propulsion by electricity of street cars and persons or corporations holding franchises by which they were obligated to pay to appellee a proportion of the gross receipts of the business pursued by the owners of such franchise. We have, in our statement of the essential facts shown at trial, recited the circumstances attending the original entry into the city of appellant's predecessor in title, as well as those relating to all subsequent extensions, and it is now pertinent to make the further statement of fact that appellee, prior to the institution of this suit and in the year 1907, amended its charter, wherein among other things, it was provided that thereafter all persons or corporations, or their assigns or successors, to whom franchises might be granted should, as compensation for the privilege granted by such franchise, pay appellee a sum not less than 4 per cent. of the gross receipts of the business pursued by the holder of such franchise. Subsequent to the amendment another telephone company, a competitor of appellant, entered upon the streets, alleys, highways, etc., of appellee under the provisions of said amended charter, and at the time of the commencement and trial of the instant case was engaged in the city of Dallas in the telephone business in competition with appellant, and, as shown by the ordinance involved herein, was exempted from the payment of the pole charge. It was, however, paying appellant 4 per cent. of its gross receipts for permission to use its streets. Appellant was not paying such portion of its gross receipts. There were also certain corporations, at the time of filing this suit and the passage of said ordinance, operating over appellee's streets, alleys, and highways, street railways for the transportation of passengers, who had on said streets, etc., trolley poles upon which wires were strung for the purpose of propelling its cars by electricity. Such corporations, as shown by said ordinance, were also exempt from the charges therein levied.

Upon the foregoing facts and the provisions of the ordinance, as stated, appellant bases its claim that the ordinance denies to it the equal protection of laws guaranteed it by the provisions of the state and national Constitutions, and asserts, in effect, that the ordinance is class legislation of the character that renders the ordinance invalid and unenforceable. Class legislation or laws that affect a particular class are not unenforceable for that reason alone. The right of the Legislature to classify persons, corporations, or subjects for taxation, regulation, or

restriction in the broadest sense is not an open question under either our state or national Constitution, and the right to classify includes the right to exempt, as does the right to exempt include the concurrent right to discriminate. The rule of law in reference to the right of classification in the light of the constitutional provisions urged by appellant in force in this state is, of course, the rule adopted by the Supreme Court of the United States in applying to the state Constitutions and laws that provision of the national Constitution which guarantees to all the citizens of all the states of the United States the equal protection of the laws. In the case of Insurance Co. v. Chowning, 86 Tex. 654, 26 S. W. 982, 24 L. R. A. 504, the rule in this state with reference to classification, was stated as follows:

"When legislation applies to particular bodies or associations, imposing upon them additional liabilities, it is not open to the objection that it denies to them equal protection of the laws, if all persons brought under its influence are treated alike under the same conditions."

The rule cited is from Missouri Pacific Railroad Co. v. Mackey, 127 U. S. 209, 8 Sup. Ct. 1161, 32 L. Ed. 107, and is the present existing general rule in this and most, if not all, the other states of the Union, and under the rule nearly every conceivable character of classification, so long as it is reasonable and just, has been sustained. In the same case it is further said, "If all persons subject to it are treated alike under similar circumstances and conditions in respect both of the privileges conferred and the liabilities imposed," the constitutional inhibition has no application. It is also said in Magoun v. Illinois Trust & Savings Bank, 170 U. S. 283, 18 Sup. Ct. 594, 42 L. Ed. 1037:

"What satisfies this equality has not been, and probably never can be, precisely defined. Generally it has been said that it 'only requires the same means and methods to be applied impartially to all the constituents of a class, so that the law shall operate equally and uniformly upon all persons in similar circumstances'" (citing Kentucky Railroad Tax Cases, 115 U. S. 321, 6 Sup. Ct. 57, 29 L. Ed. 414).

It was further said in Magoun's Case, supra, that:

"It does not prohibit legislation which is limited, either in the objects to which it is directed or by the territory within which it is to operate. * * * But what is the test of likeness and unlikeness of circumstances and conditions? These expressions have almost the generality of the principle they are used to expound, and yet they are definite steps to precision and usefulness of definition, when connected with the facts of the cases in which they are employed. With these for illustration it may be safely said that the rule prescribes no rigid equality and permits to the discretion and wisdom of the state a wide latitude as far as interference by this court is concerned."

It is also said in the same case that the rule—

"is not without limitation, of course. 'Clear and hostile discriminations against particular persons and classes, especially such as are of unusual character, unknown to the practice of our governments, might be obnoxious to the con-

stitutional prohibition.'" Bell's Gap Railroad v. Pennsylvania, 134 U. S. 232, 10 Sup. Ct. 533, 33 L. Ed. 892.

But it was also said, in Brown-Forman Co. v. Kentucky, 217 U. S. 563, 30 Sup. Ct. 578, 54 L. Ed. 883:

"This restriction does not compel the adoption of 'an iron rule of equal taxation,' nor prevent variety in methods of taxation or discretion in the selection of subjects, or classification for purposes of taxation of either properties, business, trades, callings, or occupations. This much has been over and over announced by this court."

Under the rule stated in the several ways by the citations quoted, what is the position occupied by appellant, and what equal protection of the law has it been denied, and what lack of equality or uniformity is shown by the ordinance as between appellant and similar concerns similarly situated? None we conclude. We do not understand that the rule which permits legislative bodies to classify persons, corporations, trades, businesses, subjects, etc., in order that the burdens of government may be justly and equally borne, denies them the right to classify classes. The rule announced by our Supreme Court in Insurance Co. v. Chowning, supra, comprehends such necessity in the varied and complex situations necessarily arising from the different situations and conditions of those who are to be so charged when it declares that the test shall be that all of the constituents of the particular class shall be "treated alike under like conditions." The rule, as stated in Magoun's Case, also contemplated the classification of classes in the holding that all should be treated "alike under like circumstances and conditions, both in the privilege conferred and the liabilities imposed." The right to subdivide a given class when such class is existing under dissimilar circumstances and conditions is sustained in Texas Co. v. Stephens, 100 Tex. 628, 103 S. W. 481, where it is said:

"Persons who, in the most general sense, may be regarded as pursuing the same occupation, as for instance, merchants, may thus be divided into classes and the classes may be taxed in different amounts and according to different standards. Merchants may be divided into wholesalers and retailers, and, if there be reasonable grounds, these may be further divided according to the particular classes of business in which they may engage."

An apt illustration of the right to classify classes is found in the case of Pacific Express Co. v. Seibert, 142 U. S. 339, 12 Sup. Ct. 250, 35 L. Ed. 1035, the issue being the validity of an act of the Missouri Legislature imposing a tax upon all express companies carrying on the business of transportation on contracts for hire with railroad or steamboat companies, but exempting all other concerns carrying on an express business and owning its own means of transportation, such as steamboat and railroad companies. This act was attacked upon the same grounds that the ordinance in the instant case is attacked. The classification was sustained, the Supreme Court of the United States holding there was a vital and essential distinction between express companies defined by the act and those concerns exempted from the tax, in that railroads paid taxes upon their roadbeds, rolling stock, and other tangible property, and generally upon their franchise, as did steamboat companies, while on the other hand, express companies of the kind defined by the act have no tangible property of consequence, and that the exemption was a just discrimination in order that the burdens of government might be equally borne. Is there then such essential distinction between those exempted by the ordinance here involved and appellant, as justifies the classification? We conclude there is. The ordinance levies the charge of $2 per pole against all persons or corporations occupying the streets of the city therewith, and excepts therefrom all persons or corporations owning and using poles in the operation of street railways and those which, by the terms of their franchise, pay to the city a proportion of their gross receipts. The ordinance, fairly construed, assumes that other persons and corporations occupy the streets with poles similar to those of appellant. The undisputed facts show, which we have not stated before, that several street railways occupy the streets of the city with their trolley poles, whereon wires are strung, to be used in propelling their cars by electricity; that another telephone company has poles upon the streets similar in all respects to those of appellant and used for the same purpose; that said other telephone company is operating under a franchise by which it pays to the city 4 per cent. of its annual gross receipts, furnishes free one duct in its underground conduits and one cross-arm on its poles for police and fire alarm purposes, together with 63 free telephones; that appellant does not pay the city a proportion of its earnings, yet its earnings, as indicated by the evidence, is two-thirds greater than those of the competing company; that the street railways exempted from said ordinance by the provisions of the city charter (article 10, § 1, cl. D) are required by law to pay the cost of paving the streets between their rails and 2 feet outside such rails, and may be required to drain and light streets over which they pass, and to construct and keep in repair bridges and crossings, as well as construct and maintain culverts and drains on streets over which they pass. Charter, art. 2, § 8, cl. 26. These facts indicate the inequality of the contributions to the city for the privileges enjoyed by appellant and those exempted from the provisions thereof and, in our opinion, sustain the discrimination as lawful, and the finding of the jury that they are reasonable. The matter of the payment of other taxes is, in our opinion, immaterial and beside the issue. Those exempted, as well as appellant, pay an ad valorem tax upon their tangible property, including their franchise, at least such tangible assets are subject to

an ad valorem tax, and the presumption is that it has been so subjected. All tax payments on tangible assets thus properly eliminated, since equal, it comes to this: That the constituent class to which appellant belongs is contributing a much less amount for the privilege of using the streets with its poles than are those exempted from the provisions of the ordinance, and, that being true, it follows as matter of course, that there has been no arbitrary or unlawful classification.

[6] The next issue in order of importance is the claim of appellant that, having secured from the state a permit to carry on a distance telephone business, and having paid the state the specified fees therefor, appellant was privileged to erect and maintain its poles upon the city streets free of any charge for the use and occupancy thereof. While it is true that the right of a distance telephone to pass through the cities and towns of the state is absolute, just so they do not incommode the public in the use of the public streets, etc. (City of Brownwood v. Brown Telegraph & Telephone Co. [Sup.] 157 S. W. 1163), the record in this case does not raise such issue. No denial of the right to use the streets by those poles necessary to the transaction of appellant's distance business is shown. The charge of $2 per pole for the use of the streets is not a denial of the right to pass through the cities and towns. Appellant is admittedly on the streets, and the purpose of the suit is neither to prevent entry nor to secure ouster. If the cities and towns through which distance telephones may pass are not permitted, when authorized by the Legislature, as noted in the first subdivision of this opinion, to subject them to reasonable control and regulation, which we do not decide, it was nevertheless incumbent upon appellant to make known by proper testimony the number of long-distance poles, in order that same might be excepted from the tax, particularly so since it is common knowledge of all that the number of poles necessary to bring distance wires through a city of the population of Dallas, if they are as a matter of fact carried on separate poles, are inconsiderable when compared with those necessary to transact the business necessary for a local exchange.

[7] It is next urged by appellant, without reference to other issues, that the charge of $2 per pole is unreasonable and grossly excessive. The reasonableness vel non of the charge, eliminating all issues of law, including the policy or impolicy of the discrimination alleged by appellant, which is a matter for the lawmakers, is obviously a matter of fact for determination by the jury, unless it can be said the claim of unreasonableness can be sustained as a matter of law arising upon the undisputed facts. The facts assembled by appellant as basis for such declaration, and which are undisputed, are the amounts which appellant claims are now

being paid annually by appellant as compensation to appellee for the privilege of using and occupying its streets, etc., and which include the annual rental value of certain free and half rate telephones, as well as the annual rental value of the cross-arm on appellant's poles and the duct in its conduits provided for the use of appellee by appellant. We have examined the undisputed testimony concerning the compensation now paid by appellant for the use of appellee's streets, and which is all the compensation paid therefor by appellee at any time since its entry upon the streets of the city, and we feel that it does not authorize a holding by this court that the charges levied are, as matter of law, unreasonable and grossly excessive. The point has been reviewed a number of times by appellate courts, where similar and greater charges were levied, and all sustain such a charge to be reasonable as matter of law. City of Memphis v. Postal Telegraph & Cable Co., 164 Fed. 600, 91 C. C. A. 135, 16 Ann. Cas. 342; Postal Telegraph & Cable Co. v. Baltimore, 79 Md. 502, 29 Atl. 819, 24 L. R. A. 161; Western Union Telegraph Co. v. City of Richmond, 224 U. S. 160, 32 Sup. Ct. 449, 56 L. Ed. 710.

There are a number of other issues tendered by appellant relating, in some instances, to the admission of testimony, and in others relating to the charge as given or the refusal of special charges, which we have carefully examined, and because of the conclusions we have reached as to the law of the case arising upon the undisputed facts, they do not constitute reversible error, and for that reason are overruled.

The judgment of the court below is affirmed.