**TEXAS POWER & LIGHT COMPANY,**
**Petitioner,**

v.

**CITY OF GARLAND et al., Respondents.**

No. A–11680.

Supreme Court of Texas.

March 27, 1968.

Rehearing Denied July 24, 1968.

Burford, Ryburn & Ford, Robert E. Burns, H. P. Kucera, Dallas, for petitioner.

Cary Young, Garland, McGinnis, Lochridge, Kilgore, Hunter & Wilson, James W. Wilson, Austin, for respondents.

SMITH, Justice.

Texas Power & Light Company sued the City of Garland a home rule city, to enjoin the City from requiring the Com-

pany to obtain a permit before it extended its electrical line to a new customer and from interfering with the Company's franchise rights. The Company also sought a declaratory judgment that an ordinance stating reasons for the City's denial of a permit is an unconstitutional impairment of its franchise. The City answered and sought a declaration that the ordinance is a valid exercise of the powers reserved to a City by Article 1, § 17 of the Texas Constitution, Vernon's Ann.St.; the ordinance was a lawful exercise of its police powers and the ordinance was impliedly incorporated into the franchise as a part of the Company's franchise with the City. The trial court without a jury, sustained the Company in its contentions and permanently enjoined the City from requiring a permit as a condition precedent to the extension of its line to the new customer. The Company then constructed its line. The court of civil appeals reversed the trial court. 405 S.W.2d 380. We reverse the judgment of the intermediate court and affirm the judgment of the trial court.

On August 2, 1915, City granted the Company a franchise extending to August 1, 1965. The Company does not contend that its franchise was an exclusive one. On March 28, 1949, the City enacted an ordinance requiring the Company to obtain a permit before extending any of its services. The 1949 ordinance authorizes the denial of a permit for any one of thirteen reasons. On August 4, 1964, the City by ordinance, extended the term of the original franchise from August 1, 1965, to August 1, 1990.

The City, some time after it granted the 1915 franchise, installed its own electric plant and it now provides about eighty-five per cent of the electrical service to the inhabitants of the City. In 1965 the firm of Chiles & Stockton planned to build a 118-unit apartment complex on the south side of Walnut Street in Garland. It applied to the Company for service because it preferred the Company's service to that of the City. The Company then applied

to the City for a permit to extend its line 1500 feet to and across Chiles & Stockton's property. The City Council denied the Company's application. The only reason given for the denial is found in the City Manager's recommendation to the City Council that "the City of Garland has always intended to serve this area and due to the fact that Texas Power & Light Company's nearest source would require the construction of a new line of approximately 1,500 feet." Our decision requires an examination of the three relevant documents:

*1915 Franchise*

"Section 1: That there is hereby granted to Texas Power and Light Company, its successors and assigns, (herein called the Grantee) the right, privilege and franchise until *August 1st,* A.D.1965 to construct, maintain and operate in the present and future streets, alleys and public places of the City of Garland, and its successors, electric light and power lines with all of the necessary or desirable appurtenances, (including underground conduits, poles, towers; wires, transmission lines and telegraph and telephone wires for its own use), for the purpose of supplying electricity to the said city, the inhabitants thereof and persons and corporations beyond the limits thereof, for light, heat, power and other purposes.

"Section 2: Poles or towers shall be so erected as to interfere as little as possible with traffic over streets and alleys. The location of all poles and towers or conduits shall be fixed under the supervision of the street and alley committee of the City Council or the successors to the duties of that committee, but not so as to unreasonably interfere with the proper operation of the said lines.

"Section 3: The service furnished hereunder to said City and its inhabitants shall be first class in all respects, considering all circumstances, and shall be subject to such reasonable rules and regu-

lations as the grantee may make from time to time. The Grantee may require reasonable security for the payment of its bills. Where meters are used they shall be furnished and maintained by the Grantee, without rental or other charge.

"Section 4: The Grantee shall hold the City harmless for all expense or liability for any act or neglect of the Grantee hereunder.

"Section 5: The Grantee shall file its written acceptance of this franchise within thirty days after its passage and approval."

*Section 10 of the 1949 Ordinance*

"The permit provided for herein may be denied in the discretion of the Governing Body if any of the electrical facilities, appurtenances, apparatus, poles, wires, transformers, cross arms used to conduct, transmit or generate electrical power, energy, or current, or any one of them whether in combination or singly constitutes:

"(a) a nuisance, a hazard or is likely to become such; or

"(b) results in duplication of services in an area, addition or portion of the City of Garland, with electric facilities installed, contemplated or planned as extensions of the City's Municipal Electrical Systems; or

"(c) an interference with the orderly, economic, prudent and useful extension of the electrical facilities, equipment, transmission lines and generating facilities of the municipally owned electrical power plant and distributing equipment, or likely to become such; or

"(d) a denial or a likely interference with electrical services requested to be furnished by the municipally owned electrical power plant and facilities, or an expressed preference for such municipally owned electrical service; or

"(e) an unnecessary extension of the transmission facilities; or

"(f) an extension of electrical services resulting or likely to result in a loss of domestic and commercial customers, reduced income from investment by the City of Garland and its municipally owned electric plant and equipment; or

"(g) is likely to cause any reduction or earning power or capacity or reduction of net income to the City of Garland in the operation of its municipally owned electric plant; or

"(h) a direct or indirect impairment of any outstanding City of Garland revenue or general obligation bonds, or is likely to result in a reduction of net income available to retire revenue bonds of the City of Garland, and those bonds to be liquidated out of electric plant operations; or

"(i) an interference with any governmental or proprietary function of the City of Garland; or

"(j) a direct or indirect condition or situation that might influence the granting, extension, regranting or renewal of any franchise; or

"(k) unnecessary above ground transmission facilities; or

"(l) unsightly, unusual and unnecessary above ground transmission facilities depreciating or likely to depreciate the value of adjoining private and public property; or

"(m) a possible basis or claim to be a vested right in property or to a contract upon the expiration of a franchise.

"A determination by the Governing Body that any one of the foregoing reasons exists shall be sufficient basis for denial of the permit."

*1964 Ordinance Extending 1915 Franchise*

"Section 1. That the electric light, heat and power franchise heretofore granted to the Texas Power & Light Company by

ordinance adopted by the City Council of the City of Garland, Texas, on August 2, 1915, be extended for a period of twenty-five (25) years from and after the expiration date named therein so that the term of such franchise will extend to the 1st day of August, 1990.

"Section 2. The grantee in such franchise, to-wit Texas Power & Light Company, shall file its written acceptance of this extension of said franchise within sixty (60) days after the passage and approval of this ordinance."

The City's basic contention is that Article 1, § 17, of the Texas Constitution reserves in the City the power to prohibit future expansion of the Company's facilities and to do so unilaterally by an amendment or partial revocation of the franchise which it granted and the Company accepted. It relies upon Mayor, etc. of City of Houston v. Houston City St. Ry. Co., 83 Tex. 548, 19 S.W. 127 (1892) which discussed the constitutional reservation of powers. The Company, however, relies upon the direct holding of the same case and argues that Article 1, § 19 of the Constitution must be construed with § 17. The two provisions of the Bill of Rights are:

"Sec. 17. No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the State, such compensation shall be first made, or secured by a deposit of money; *and no irrevocable or uncontrollable grant of special privileges or immunities, shall be made; but all privileges and franchises granted by the Legislature, or created under its authority shall be subject to the control thereof.*" (Emphasis added.)

"Sec. 19. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."

The franchise in *City of Houston,* as is the case with that granted by City of Garland, was not exclusive. In both cases the municipality granted a franchise for a term of years for the use of all streets. In *City of Houston* the franchise was to a street railway company to operate "over any and all streets of the City of Houston." In this case the franchise granted "the right, privilege and franchise * * * to construct, maintain and operate in the present and future streets, alleys and public places of the City of Garland. * * *" In both cases the municipality later enacted an ordinance attempting to repeal or annul the effect of the franchise it had previously authorized. In both, the City made no effort to oust the utility entirely.

*City of Houston* struck down the municipality's attempt to repeal or annul the franchise by the subsequent ordinance. It held that the City of Houston had the power to grant the franchise but could not "abandon or transfer its ordinary control over the streets of a legislative character" and could not create a monopoly, neither of which the City of Houston had done. The court then stated that there was no claim that the use of the streets by the utility had "become a nuisance or amounts to an injury to the public * * *." These holdings meant that the City of Houston did not possess the power to amend the franchise or prohibit its full exercise, though it at all times had the reserve power of ordinary control which we construe to mean the reasonable exercise of its police powers. City of Los Angeles v. Los Angeles Gas & Electric Corporation, 251 U.S. 32, 40 S.Ct. 76, 64 L.Ed. 121 (1919); 37 C.J.S. Franchises § 24; 12 McQuillin, Municipal Corporations, § 34.74 (3rd. ed. 1949).

The court in *City of Houston* then discussed Article 1, § 17, though it had not been raised by the parties. It stated that § 17 must be read in connection with § 19 of the Bill of Rights, saying:

"* * * When we consider the effect and consequences of declaring that every grant of special privileges or franchises

for a term of years by the state could be revoked or withdrawn at the mere pleasure or will of the legislature, we then very much doubt that the framers of the constitution, or the people in adopting it, intended to reserve to or confer such power or authority upon the legislature. The policy of the state seems to have been to encourage the building of railroads and the investment of capital in similar enterprises. If these special privileges or franchises in question can be recalled or terminated at the will of the legislature, then it would follow that, under the same reservation in the original law, every charter granted, since the adoption of the present constitution, to any railroad, telegraph, or telephone company * * * could be repealed or revoked at the pleasure of the legislature, without the necessity of a judicial forfeiture. * * * And hence we invoke section 19 of the bill of rights, which not only protects property, but also 'privileges or immunities;' from destruction, 'except by due course of the law of the land.' While not conclusive of the question, still this provision affords some evidence of the general purpose of the constitution; and that its authors did not intend, by the declaration contained in section 17, to announce that the continuance or duration of every privilege or immunity, which might be created by the legislature or under its authority, should be entirely dependent upon its caprice or will. * * * With the light before us at this time, we think that the better opinion is that this particular clause of the constitution was intended to prohibit the legislature from granting any 'special privilege or immunity' in such way, or of such character, as that it could not be subsequently annulled or declared forfeited for such causes as might be defined by the law, or condemned in the exercise of eminent domain, * * * and it was further intended that 'all privileges and franchises' granted by the legislature, or under its authority, should at all times remain subject to legislative control and regulation. * * *.''

*City of Houston* was cited in City of Baird v. West Texas Utilities Co., 174 S.W. 2d 649 (Tex.Civ.App.1943, writ ref.) for the holding that a franchise is a vested or valuable property right which may not be impaired. 5 McQuillin, § 19.39 (3rd. ed. 1949). The City of Baird granted a franchise to a named company, its successor and assigns. The franchise was assigned to West Texas Utilities, and the City of Baird sought to enjoin further operations within the City because it had not consented to the assignment. In rejecting the City's contention, the court said:

"* * * The effect of this suit is one of ouster, working a forfeiture of property rights of holder in connection with the franchise. Such would be in contravention of appellee's constitutional rights under Article 1, sec. 19, Constitution of Texas."

The court went on to make clear the nature of the powers reserved to the City. It is a "reasonable control * * * at least to the extent such control has been delegated to such city by the State, or may hereafter be so delegated by legislative authority."

A number of cases uphold the right of municipalities to exercise reasonable control and regulation over franchise holders. Storrie v. Houston City St. Ry. Co., 92 Tex. 129, 46 S.W. 796, 44 L.R.A. 716 (1898) upheld the municipality's power to impose the cost of paving that part of its streets between and along the rails of a company which held a franchise. Corpus Christi Gas Co. v. City of Corpus Christi, 283 S.W. 281 (Tex.Civ.App.1926, writ ref.) was an action to restrain a gas company from digging trenches along city streets. Southwestern Telegraph & Telephone Co. v. City of Dallas, 174 S.W. 636 (Tex.Civ. App.1915, writ ref.) upheld the power of the city to impose a reasonable charge for the use of the city streets by the telephone company which had already paid for the privilege of entering the city with its poles and lines. The vested right to use the streets was not disturbed, said the court.

San Antonio Traction Co. v. Altgelt, 200 U.S. 304, 26 S.Ct. 261, 50 L.Ed. 491 (1906) affirming 81 S.W. 106 (Tex.Civ.App.1904, writ ref.) upheld the power of the City of San Antonio to force a railway company operating under a franchise to charge lower rates than those specified in its franchise. However, it was held in State v. Lone Star Gas Co., 86 S.W.2d 484 (Tex. Civ.App.1935, writ ref.), rev'd on other grounds, 304 U.S. 224, 58 S.Ct. 883, 82 L.Ed 1304, "The right of the state to regulate the rates and practices of a public utility is referable to the police power of the state, and is a legislative function which cannot be alienated or contracted away by the state or any agency or political subdivision of the state." See also, Dallas Ry. Co. v. Geller, 114 Tex. 484, 271 S.W. 1106 (1925). The cases cited impose incidental burdens upon the franchise, but none of them goes so far as to be a partial ouster of the right to provide service granted by a franchise.

The rule announced in *City of Houston* has never been overruled. It means that a city may bind itself by a franchise, so long as it does not surrender or contract away its police or governmental powers. State v. Missouri, K. & T. Ry. Co. of Texas, 99 Tex. 516, 91 S.W. 214, 5 L.R. A.,N.S., 783 (1906); 23 Am.Jur., Franchises, § 19. The rule is stated generally in 5 McQuillin, Municipal Corporations, § 19.37:

"The constitutional provision against impairment of contracts does not prohibit ordinances duly enacted under the police power to protect the safety and welfare of the public. * * * The authority of the state itself or its constituted agencies to exercise the police power is implied in every contract made by and between individuals, partnerships, corporations or public utilities. * * *

" * * *

" * * * In other words, municipal franchises affecting subjects within the police power must be considered as embracing the right of the grantor to legis-

late with respect to such subjects unfettered by the franchise provisions, and such legislation does not, therefore, impair the obligation of the franchise.

" * * * Generally speaking a rate ordinance does not impair the obligation of a franchise; such an ordinance, at least where it is reasonable and constitutes a proper exercise of the municipal police power, does not impair the obligation of a franchise contract. * * *."

Thus, the provisions of the 1949 ordinance invoked by the City to deny the permit must constitute a reasonable exercise of the City's police power; otherwise, the City violates Article 1, § 19 of the Texas Constitution. The reasonable scope of police powers which may be exercised with respect to a utility providing electrical service is well stated in State ex rel. Cleveland Electric Illuminating Co. v. City of Euclid, 169 Ohio St. 476, 159 N.E.2d 756 (1959). A franchise is subject to the police power exercised to:

" * * * [D]irectly promote the general health, safety, welfare or morals * * *; the means adopted to accomplish the legislative purpose must be suitable to the end in view, must be impartial in operation, must have a real and substantial relation to such purpose and must not interfere with private rights beyond the necessities of the situation."

The foregoing definition of the police power is consonant with the underlying ideas expressed in the *City of Houston* case. Those fundamental concepts protect the contractual rights of the private enterprise from arbitrary and unreasonable alteration by legislation, unless the statute or ordinance directly promotes the general health, safety, and welfare of the public. We think this is the true meaning arising from the interrelation of Article 1, § 17 and Article 1 § 19 of the Texas Constitution. The question, therefore, is whether the provisions of the 1949 ordinance invoked by the City qualify as an exercise of the police power directly promoting legiti-

mate concerns of the government. The 1949 ordinance contains provisions which may be discussed in groups.

Section (a) of the ordinance authorizes the City to deny a permit when the proposed facility constitutes "a nuisance, a hazard, or is likely to become such." The City, however, did not base the refusal of the permit on the grounds that the extension would constitute a hazard or nuisance. To the contrary, the City agreed at the trial of the case that the proposed extension presented no hazards to the public safety. The reason the City assigned for its denial of the permit was the City's intent to serve the area in the future. Thus, subdivisions (a), (j), (l), and (m) of the 1949 ordinance are not relied upon by the City and are not here involved.

 Sections (c), (d), (f), (g), (h) and (i), authorizing the denial of a permit by reason of competitive interference with the City's electrical service, are aimed directly at the advancement of the City's economic and proprietary interests. Under these provisions the City urges that it possesses the power to amend the franchise and that its power is broad enough to require City Council approval as a prerequisite to expansion by the Company. In other words, the City contends that it may wholly curb any expansion under the non-exclusive franchise held by the Company. Obviously these provisions have for their purpose the elimination of the Company as a competitor beyond its existing lines. They accord preferments ousting the Company from exercising rights in an area granted by its franchise. These things the City cannot do: Essential franchise rights cannot be taken under a pretense of regulation designed to gain a competitive advantage to the City acting in its proprietary capacity. The City has no right to barter with the police power. When the City authorized the extension of the franchise it contractually submitted itself to economic competition. Conversely, the Company received rights protected by Article 1, § 19 of the Texas Constitution. The

right to use the present and future streets of the City of Garland cannot now be altered by legislation, unless the ordinance provisions listed above have a reasonable relationship to the protection of the public health, safety, morals or welfare. Sections (c), (d), (f), (g), (h) and (i) are destructive of the franchise rights rather than regulatory in nature; therefore, they are void. American Consumer Industries, Inc. v. City of New York, 28 A.D.2d 38, 281 N.Y.S.2d 467 (1967); City of Akron v. Public Utilities Commission, 149 Ohio St. 347, 78 N.E.2d 890 (1948); Eighth Avenue Coach Corp. v. City of New York, 170 Misc. 243, 10 N.Y.S.2d 170 (S.Ct.1939); Wisconsin Tel. Co. v. City of Milwaukee, 223 Wis. 251, 270 N.W. 336 (1936).

 The remaining sections are (b), (e) and (k). These provisions, designed to prevent duplication of present or future City electrical systems, are said to be within the City's police power. We hold that these three sections are void because they do not state a reasonable standard aimed at protecting the safety or welfare of the public. They in no way control the City's exercise of discretion. Sections (b), (e) and (k) do not increase safety factors or limit danger by prescribing uniform requirements for all equipment and construction of lines similar to an electrical safety code. We think the City has:

"* * * ample authority under its police power to make reasonable provisions for the protection of the public and to maintain high but uniform standards of safety in the transmission and distribution of electricity within its boundaries by imposing safety regulations which, although protecting, fall short of prohibiting the exercise of the powers granted in the franchise." City of Tukwila v. City of Seattle, 68 Wash.2d 611, 414 P.2d 597 (1966).

 Attempting to uphold the denial of the permit by reason of sections (b), (e) and (k), the City argues that there is an unnecessary duplication of facilities be-

cause the City lines are closer to the Chiles & Stockton apartments. In one sense, only one of the electrical suppliers is needed; however, to give the sections of the ordinance the meaning advocated by the City would virtually eliminate all expansion by the Company. Such an interpretation would unlawfully impair the Company's franchise. From an examination of the physical circumstances, we conclude the trial court correctly ruled "that the refusal of the defendants to grant plaintiff a permit * * * is without basis or foundation in law or in fact."

The Chiles & Stockton apartment complex is located in an open and undeveloped area west of the populated portion of Garland. The land is situated between Walnut Street and Forest Lane, streets extending westerly from Garland. Walnut is about one-half mile north of Forest Lane. The City had a line along Walnut and the Company had a line along Forest Lane with an extension north from Forest Lane to a point about half way between the two streets. From that point the Company intended to extend its line to reach the new customer. To do so, it would run the line across vacant undeveloped property. At that time, neither line occupied the large open area between Forest Lane and Walnut. The Company and City lines ran along different streets and neither crossed the other at any point, nor did they occupy the same easements. Two competitors were seeking to serve an undeveloped area, and the customer preferred the Company's service. We see no reason to allow the municipally owned corporation a competitive advantage over the privately owned corporation in this situation. See Public Service Commission v. City of Paris (Vanmeter v. Elvove), 299 S.W.2d 811 (Ky.1957). Without stating standards by which the City can govern the exercise of its discretion, Sections (b), (e) and (k) allow the City to arbitrarily exercise its governmental power to exclude competition in an undeveloped area. The three sections are void because they do not provide adequate standards to govern the discretion of the City. Weiner v. Borough of Stratford, Camden County, 15 N.J. 295, 104 A.2d 659 (1954); 5 McQuillin, Municipal Corporations, § 1812 (3rd. ed. 1949).

Finally, it is our opinion that the 1964 ordinance which extended the 1915 franchise did not impliedly incorporate the 1949 ordinance as additional contractual limitations upon the Company's franchise. The intermediate court held that the ordinance was incorporated into the franchise, relying upon Nueces Valley Townsite Co. v. San Antonio, U. & G. R. Co., 123 Tex. 167, 67 S.W.2d 215 (1933); and Winder Bros. v. Sterling, 118 Tex. 268, 12 S.W.2d 127, 14 S.W.2d 802 (1929). There are several reasons that the ordinance was not so incorporated.

The 1949 ordinance could not have been enacted as a valid contractual limitation upon the 1915 franchise. The 1949 ordinance, aimed at controlling activities outside the City's police power, was an invalid impairment of the original franchise ordinance when it was enacted; therefore, it cannot now be impliedly incorporated into the valid franchise ordinance passed in 1964.

The City had the power to limit the Company to its existing services at the time it granted the 1964 extension. Athens Telephone Co. v. City of Athens, 182 S.W. 42 (Tex.Civ.App.1916, writ ref.). It is significant that the City granted a franchise which clearly and unambiguously declared a purpose repugnant to the idea of implied incorporation. The Company over a period of several years before the extension had challenged the validity of the ordinance, City of Garland v. Texas Power & Light Co., 342 S.W.2d 816 (Tex.Civ. App., 1961, no writ). With this history of prior litigation in which the courts had held the ordinance invalid on a temporary injunction appeal, the City granted an extension by an ordinance that declared its purpose was to extend the original 1915 franchise without amendment.

■ The preamble of the ordinance says it was enacted to *"extend* the terms of said franchise 25 years from its present expiration date." The ordinance consisted of two short sections. The first provided that the "franchise heretofore granted * * * be *extended* for a period of twenty-five (25) years. * * *" Section 2 required the Company to file its written acceptance "of this *extension* of said franchise within sixty (60) days. * * *" This court recently held that there is a difference between an extension of an existing contract and the making of a new one. The term "extension," as applied to rights under an oil and gas lease, means the prolongation or continuation of the same terms and provisions of an existing lease. We held there was no extension if the provisions of the new agreement differed from those already in existence, there was a new consideration, and the former lease had already terminated. Sunac Petroleum Corporation v. Parkes, 416 S.W.2d 798 (Tex.Sup.1967). Conversely, we hold that the 1964 ordinance was enacted before the 1915 franchise expired and was extended upon the identical terms provided in the original franchise.

The franchise was a broad grant to operate on the present and future streets of Garland. The City's contention is that the franchise by implication was limited to areas in Garland where the Company was then located, and without the right to expand. The conflict between the express terms of the grant and the claimed implications by the City, taken with the history and invalidity of the ordinance at the time it was passed is so sharp that we must reject the contention the ordinance was impliedly incorporated as a part of the contract.

We conclude that Sections (a), (j), (l), and (m) of the 1949 ordinance are not in issue and we express no opinion as to their validity. The other sections are not valid police regulations and are void. The

judgment of the court of civil appeals is reversed and that of the trial court is affirmed.

## DISSENTING OPINION

CALVERT, Chief Justice.

Because this case is of tremendous importance to all Texas municipalities and to all public utility corporations operating under franchises granted by municipalities, the issues should be clearly stated and my areas of disagreement with the majority opinion should be sharply defined.

Texas Power & Light Company's action for injunctive relief was predicated on two theories: (1) that the city ordinance requiring it to obtain a permit before installing facilities extending its lines in the corporate limits of the City of Garland is violative of the Company's constitutional rights, and is unreasonable and arbitrary, and for both reasons is void, and (2) that the action of the City Council in denying a permit to install the particular facilities was arbitrary and unreasonable and therefore void. The first theory thus attacked validity of the City Council's action in the exercise of its *legislative* powers, and the second theory attacked validity of its action in the exercise of its *administrative* powers.[1] Both bases for the granting of relief were expressly controverted in the City's answer.

The trial court did not expressly render a declaratory judgment as to the validity or invalidity of the ordinance as a whole, or, as the majority has done, as to certain isolated sections of the ordinance. Neither did the trial court's judgment permanently enjoin the City from enforcing or attempting to enforce the ordinance as the Company requested. Its judgment merely enjoined requirement of a permit for construction and operation of the particular facilities and interference therewith on the ground that refusal to grant the permit was "without basis in law or in fact." The trial court's judg-

---

1. Emphasis mine throughout unless otherwise indicated.

ment thus seems to recognize that the ordinance requiring permits is valid but decrees that the City Council's action in denying the particular permit was arbitrary and unreasonable.

The task of writing a dissenting opinion in this case has been made unduly burdensome, and the opinion is required to be of unwelcome length, because of certain holdings by the majority which are unnecessary to a decision of the case and because of other writing which makes the vital holdings obscure. These matters will be examined in greater detail at a later point in this opinion.

My points of disagreement with the majority opinion will be more sharply defined if the areas of agreement are indicated. I agree with the holdings, express or implied, that (1) Article I, § 17 of the Texas Constitution does not reserve power in a municipality to revoke a franchise or to amend it to the extent of destroying or nullifying rights which have become vested; (2) a municipality has authority as an incident of its police power to impose reasonable regulations upon the exercise of vested rights granted by a franchise; (3) regulations imposed upon the exercise of vested franchise rights are reasonable, and a proper exercise of a municipality's police power, if they promote the health, safety, morals or general welfare of the inhabitants of the municipality; (4) an ordinance which confers discretion upon the governing body of a municipality to grant or to deny a permit to use city streets must contain adequate standards governing the exercise of discretion. With agreement to these holdings and pronouncements of guiding general principles of law behind me, I turn to the specific rulings of the majority to determine which are necessary to a decision of this case and which are strictly gratuitous and unnecessary to the decision.

Once it is held that Article I, § 17 of the Constitution does not reserve power in the City to revoke the Company's franchise to use City streets for future extension of its facilities, and that section (b) of section 10 of the ordinance does not contain adequate standards for governing the City Council's discretion in granting or denying particular permits, all other rulings by the majority on specific issues are unecessary to the judgment entered. It is thus unnecessary to decide and hold, as the majority does, that sections (c), (d), (e), (f), (g), (h), (i) and (k) are invalid. It is also unnecessary to decide and hold if the majority opinion does so, that the City Council's action in denying the particular permit was arbitrary and unreasonable.

Having agreed with the majority's holding that Article I, § 17 of the Constitution does not reserve absolute power in the City to revoke or amend the Company's franchise so as to prevent all expansion of its facilities after 1949, I will first direct my attention to the only other holding which is necessary to the court's judgment, i. e., that section (b) of section 10 of the ordinance is invalid because it does not contain adequate standards for governing the City Council's discretion in granting or denying permits. The section provides that a permit may be denied if granting it

"(b) results in duplication of services in an area, addition or portion of the City of Garland, with electric facilities installed, contemplated or planned as extensions of the City's Municipal Electrical Systems * * *."

In writing on motion for rehearing, the majority rejects the argument that any indefiniteness in the section may be eliminated by excising the words, "contemplated or planned". To do so, says the opinion, would be to change "the purpose" of the section and would "constitute new legislation on our part." I disagree. The section quite obviously has *two* purposes, to wit: (1) to prevent duplication of City facilities which are "installed," and (2) to prevent duplication of "contemplated or planned" City facilities. The ordinance contains a severability clause. The clause provides that if "any section, paragraph, subdivision, clause, phrase or

provision" of the ordinance is adjudged invalid, the validity of the ordinance as a whole or of any other part shall not be affected by the ruling. This clause clearly indicates that section (b) would have been enacted by the City Council if the words "contemplated and planned", had not been included. The fact that their excision would frustrate the second purpose of the section is not a valid reason for striking down the entire section and frustrating the first purpose. Cases in which this court has performed this type of judicial surgery on legislative enactments are legion. As examples, see the recent cases of Gerst v. Nixon, 411 S.W.2d 350 (Tex.Sup.1967), and Eades v. Drake, 160 Tex. 381, 332 S.W.2d 553 (1960). In *Eades,* the legislative enactment under review had two purposes, to wit: (1) to create a new district court for Dallas County, and (2) to limit the term of the judge first elected to two years. We struck down the provision for achieving the second purpose, but upheld the validity of the provision for achieving the first. Then, in order to sustain validity of the entire enactment, we read into it a constitutional provision for a four year term for the judge first elected. In *Gerst,* the legislative enactment under attack had two purposes, to wit: (1) to provide judicial review of administrative action on the record made before the administrative agency, and (2) to require that the judicial decision should be made independently of the administrative decision and from a preponderance of the evidence. We struck down the provision for independent judicial decision based upon a preponderance of the evidence, but upheld validity of the provision for judicial review on the record made before the administrative agency. Then, in order to sustain validity of the entire enactment, we read into it a provision for judicial review under the substantial evidence rule.

But, the majority says, in its opinion on rehearing, that if the words, "contemplated or planned", were stricken, section (b) would still be invalid because of lack of standards with which to measure the meaning of the words, "area" and "duplication". In this connection, the majority notes that, "[C]ity urges that the term 'duplication' embraces the avoidance of ruinous or cutthroat competition," and observe that, prior to the motion for rehearing, City "made no such suggestion of a standard." The majority thus confuses "purposes" of a legislative enactment with its "standards" of definiteness; the two are treated as synonymous. Actually, of course, the two concepts are altogether different. Legislative enactments rarely expressly state their "purposes", but they must always contain "standards" of definiteness. "Standards" of definiteness must appear on the face of legislative enactments, but the "purposes" of such enactments are more often than not derived by the courts from their legislative history, or from conditions and events existing or occurring prior to or contemporaneously with their enactment. "Purposes" are thus usually found by factual inquiry, while "standards" always call for a legal inquiry into the meaning of words used. Adding a statement in section (b) that its purpose was to avoid ruinous or cut throat competition would not have made the words "area" and "duplication" more definite or less vague.

I respectfully suggest that, under our own decisions and decisions of the Supreme Court of the United States, section (b), with the words, "contemplated or planned", eliminated, contains adequate standards to support its validity as a legislative enactment to govern administrative discretion. The standards are no more general or vague than are many which we have upheld as being sufficiently specific to govern administrative action. The cases cited in the City's rehearing briefs are illustrative. Southwestern Sav. & L. Ass'n of Houston v. Falkner, 160 Tex. 417, 331 S.W.2d 917 (1960), ("whether the public convenience and advantage will be promoted * * * and whether the population * * * affords a reasonable promise of adequate support * * *."); Jordan v. State Board of Insurance, 160 Tex. 506, 334 S.W.2d 278 (1960), (Conferring authority to revoke a

certificate of an insurance company if any officers or directors "are not worthy of the public confidence.") ; Housing Authority v. Higginbotham, 135 Tex. 158, 143 S.W.2d 79 (1940), (Authorizing rental of a number of rooms "which is deemed necessary to provide safe and sanitary accommodations to the proposed occupants without overcrowding.") ; Key Western Life Ins. Co. v. State Board of Insurance, 163 Tex. 11, 350 S.W. 2d 839 (1961), (Authorizing disapproval of a policy form if it "encourages misrepresentation"). In the last opinion, we quoted Davis on Administrative Law as stating that the Supreme Court of the United States had upheld, as valid, such vague standards as "just and reasonable", "public interest", "unreasonable obstruction to navigation", "reciprocally unequal and unreasonable", "public convenience, interest or necessity", "tea of inferior quality", "unfair methods of competition", "reasonable variations", "unduly or unnecessarily complicate the structure" of a holding company system, or "unfairly or inequitably distribute voting power among security holders".

This court has not shown the same concern for such refined and clearly defined standards in legislative acts conferring discretionary authority upon administrative agencies to deny permits for duplication by one private corporation of the facilities of another. Our past decisions indicate as much; and I daresay that if the two competing utilities in the City of Garland were both private corporations, an ordinance imposing a permit system and authorizing the City Council to deny a construction permit to one, when to grant it would result in "duplication" of installed facilities of the other in an "area" of the City, would not be voided for lack of adequate standards. The foregoing observations find solid support in our decisions in savings and loan cases in which the heart of the problem is always one of "duplication" of facilities in a given "area", and the statutory standards governing administrative action in granting or denying permits are even less definite.

Section 2.08, Article 852a, Vernon's Texas Civil Statutes, directs that the Savings and Loan Commissioner shall not approve a charter for a savings and loan association unless the evidence shows that "the volume of business *in the community* in which the proposed association will conduct its business is such as to indicate profitable operation," and that "the operation of the proposed association *will not unduly harm any existing association.*" Under legislative authority to make rules governing establishment of branch offices, a rule was promulgated that no application for a branch office should be approved except upon an affirmative finding that "the public convenience and advantage *in the neighborhood* proposed to be served *and in the surrounding country* will be promoted \* \* \*.", and that "the proposed operation *will not unduly injure any other association operating in the neighborhood* \* \* \* or *in the surrounding county.*" For the text of the rule, see Benson v. San Antonio Savings Ass'n, 374 S.W. 2d 423 (Tex.Sup.1963). The terms "community", "neighborhood", and "surrounding country" are surely as broad and vague in defining a place or space as is the term "area"; and "unduly harm" and "unduly injure" an existing association, is surely as vague as "duplication of services" where facilities are installed. And yet, we upheld the validity of these legislative provisions governing administrative action against a direct attack on their constitutionality for lack of adequate standards. Southwestern Sav. & L. Ass'n of Houston v. Falkner, 160 Tex. 417, 331 S.W.2d 917 (1960). What is more, we recognized in the same case that the purpose of the statute, and necessarily of the rules, was "*to protect against the evils of excessively zealous competition* through control of the number of building and loan associations in a specified *area.*" Under the statute and the rules, only the administrative agency could initially determine the boundaries of the "community", the "neighborhood", the "surrounding country", or the "area".

Even closer in point are Davis v. City of Lubbock, 160 Tex. 38, 326 S.W.2d 699 (1959), and Hardin v. Kentucky Utilities Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968). In *Davis,* we sustained the validity of a statute which authorized an Urban Renewal Agency to mark out the boundaries of a "slum area" or a "blighted area" in a city. The legislative standards for making the determination of the "area" were expressed in such vague and general language as "which is detrimental to the public health, safety, morals or welfare of *the city* * * * is conducive to the ill-health of the inhabitants of *the area* or to the transmission of disease * * * [is conductive to] high rates of infant mortality * * * it contains * * * deteriorated or deteriorating residential or non-residential buildings * * * a predominance therein of defective or inadequate streets or defective or inadequate street layout or accessibility * * *."

What the Supreme Court of the United States termed "the innate and inevitable vagueness of the 'area' concept" in a statute, seems to have troubled that court not at all in a group of cases in which it upheld the right of the Board of Directors of the Tennessee Valley Authority to determine whether it could compete with a private utility in selling electricity outside of a limited "area". Hardin v. Kentucky Utilities Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968). By the TVA Act of 1959, Congress barred the TVA from expanding its sales outside "the *area* for which the Corporation [TVA] or its distributors were the primary source of power supply on July 5, 1957," but permitted expansion within such an "area". The Court pointed out that the difficulty lay "in determining the location and extent of the 'area' to which the statute" referred; that if "area" referred to Claiborne County, sale of electricity by TVA to two villages in the county, which were connected by a narrow corridor, was permissible since TVA supplied 62% of the power in the county on the critical date, but that if the two villages and the corridor constituted an "area" under the

statute, the private utility had supplied 96% of the power in June, 1957, and the contemplated expansion by TVA was prohibited. The Court noted that one of the primary purposes of the "area" limitation in the statute was "to protect private utilities from TVA competition," but held, nevertheless, that the statute vested authority in the TVA Board to determine initially the boundaries of an "area", from an evaluation of economic and engineering factors, and thus to determine whether the county or the two villages constituted an "area" in which TVA was the primary source of power. The Court held further that administrative determination should be accepted by the courts unless it lay "outside the range of permissible choices contemplated by the statute." Even the dissenting Justice did not reject the statutory "area" test of expansion as being too vague, and disagreed only with the majority conclusion that the administrative agency's determination should be given weight in the court's determination of the same question.

The majority attempts to distinguish *Davis* and *Hardin,* but the attempt is unimpressive. It is said that in this case, the term "area" could "mean the entire city." I take it the majority means that the City Council could have defined the area as including the entire city. The same statement could have been made in Davis v. City of Lubbock, supra, but wasn't. Just as the emphasis in the legislation under review in *Davis* was upon the condition—"slum area" and "blighted area"—, the emphasis in section (b) is upon a condition—where City facilities are installed. The "condition" in the instant legislation is far more definite and readily ascertainable than the "condition" in the Urban Renewal Act. The "condition" in section (b) is also just as definite and readily ascertainable as the "condition" by which "area" was defined in the legislation under review in *Hardin.* There, the TVA was prohibited from selling electricity outside an "area" in which it or its distributors "were the primary source of power on July 1, 1957." The administrative agency

not only *could,* but *did,* define the "area" to include an entire county, and validity of its action in so doing was sustained.

Assuming then that, under our own decisions in the savings and loan cases and Davis v. City of Lubbock, and the United States Supreme Court group of cases styled Hardin v. Kentucky Utilities Co., use of the word "area" in section (b) of section 10 does not make it too vague to be valid, the only remaining question is whether use of the words "duplication of services" does so. From the writing on rehearing, use of the word "duplication" seems to be the majority's principal reason for holding section (b) void. Aside from the fact that, as I have attempted to show, the savings and loan statute and rules include an equally vague concept of duplication of facilities, expressed in slightly different words, use of the word "duplication" should present no problem of vagueness once it is conceded that the City Council can determine, subject to judicial review for arbitrary action, what is an "area" of the City. A determination of "duplication" of installed City facilities would present an even narrower problem of administrative discretion which would, of course, be subject to judicial review as having no support in substantial evidence.

The cases cited in the majority opinion in support of the lack-of-standards holding are not persuasive. City of Tukwila v. City of Seattle, 68 Wash.2d 611, 414 P.2d 597 (1966), did not involve the validity of a license or permit ordinance. There, the court struck down an ordinance of the City of Tukwila which completely ousted one of two franchised utilities from 85 to 90% of the entire territory of the City and the other from 10 to 15% thereof, which ordinance the City sought to defend on the ground that its purpose was to protect the *safety* of the inhabitants of the City. The court merely noted that there was nothing in the ordinance relating to safety factors. A licensing ordinance was struck down in Weiner v. Borough of Stratford, 15 N.J. 295, 104 A.2d 659 (1954), because it contained *no* standards; it provided that no person might "engage in or carry on any business, trade or calling" unless he paid an annual license fee and obtained a license from the borough clerk. The court stated that there was a "complete absence of any standards" in the ordinance, and it was "singularly wanting" in regulatory features. However, the court's approach to the problem, when applied to the case before us, is even more meaningful than its decision. The court said: "We search in vain for *any general rule of action or standard of conduct in this ordinance governing the borough council* in its determination whether to grant or deny the application for a license to conduct a new business."

I can see no need to strike down section 10(b), and no basis for doing so except that we cannot find any other theory which will support a judgment for the Company. The Company did not even suggest in any of its briefs that this section was invalid for lack of standards; and, in my opinion, we have strained the "adequate standards" theory far beyond our past holdings in that area and beyond what we would have done if the competing utilities were both privately owned.

The majority has also held sections (e) and (k) of section 10 void for lack of standards, and sections (c), (d), (f), (g), (h) and (i) void, because they "have for their purpose the elimination of the Company as a competitor beyond its [City's] existing lines * * * accord preferments ousting the Company from exercising rights in an area granted by its franchise," and take essential franchise rights "under a pretense of regulation designed to gain a competitive advantage to the City acting in its proprietary capacity." At the same time, the majority declines to rule on the validity of sections (a), (j), (*l*) and (m) on the ground that they "are not relied upon by the City and are not here involved." Neither, I add, has the City relied upon sections (e), (k), (c), (d), (f), (g), (h) and (i). This fact should be entirely clear from the City's points of error in its appellant's brief in the court of civil appeals,

and particularly from its opening statement in its argument therein, which reads as follows:

*"The Garland City Council denied Appellee's application to extend its electrical distribution facilities to the property in question for the reason that the proposed extension would duplicate the existing municipal service. Since Section 10(b) of Ordinance No. 275 specifically authorizes the City Council to deny applications on this ground, the only questions before the Court in this appeal are whether the City of Garland may validly prohibit extensions by TP&L which duplicate existing municipal service, and if so, whether the Council's determination under the ordinance is reasonably supported by substantial service [evidence]."*

The Company had no cross-points of error in its brief in the court of civil appeals complaining of the failure of the trial court to declare the many other lettered sections invalid. It is thus difficult to understand why the majority has chosen to look beyond section (b) to declare some of the other sections void, when that action is unnecessary to its decision of the case, while declining to pass on the validity of still other sections.

I shall not concern myself with the validity of sections (e) and (k) since the ruling on these sections is of little significance. The gratuitous holding that sections (c), (d), (f), (g), (h) and (i) are invalid, and the reasons given for the holding, are, however, serious and of far-reaching significance, and should not be permitted to stand without challenge.

The majority opinion examines the police power as a basis for holding sections (c), (d), (f), (g), (h) and (i) valid, and concludes that they are invalid because the police power will not support ordinance provisions authorizing denial of an extension permit to protect the municipal plant from economic competition. I do not agree that an ordinance requiring a permit for extension of private utility facilities and authorizing denial of a permit to protect the City's investment in a competing utility facility, reasonably and not arbitrarily administered, is invalid, per se, as being outside the police power to promote the general welfare of the inhabitants of the City.

All of the sections are lumped together for destruction, and are declared invalid because the majority has found that their "purposes" are unlawful. Sections (f), (g) and (h) are typical and are quoted here:

"(f) an extension of electrical services resulting or likely to result in a loss of domestic and commercial customers, reduced income from investment by the City of Garland in its municipally owned electric plant and equipment; or

"(g) is likely to cause any reduction of earning power or capacity or reduction of net income to the City of Garland in the operation of its municipally owned electric plant; or

"(h) a direct or indirect impairment of any outstanding City of Garland revenue or general obligation bonds, or is likely to result in a reduction of net income available to retire revenue bonds of the City of Garland, and those bonds to be liquidated out of electric plant operations; * * *."

The provisions contain absolutely no language eliminating the Company as a competitor beyond existing lines, according preferments ousting the Company from exercising rights in an area granted by its franchise, or designed to give the City a competitive advantage. They speak in terms of *protecting* the City from *loss* of customers, *reduction* of income, and *impairment* of bonds. Surely, achievement of these ends is for the general welfare of the inhabitants of the City and is a legitimate concern of government, and provisions of an ordinance designed to achieve such purposes is a reasonable exercise of the City's police power.

To reach the conclusions quoted from the majority opinion as a basis for holding the sections invalid, the *language* of the sections must be twisted exactly 180 degrees. Moreover, the conclusions must be reached with absolutely no evidence in the record to support them except the Company's ex parte statement in its briefs, and in violation of a sound rule of law, universally accepted, that courts will not inquire into or attribute improper motives to governing bodies of municipalities in the enactment of ordinances. 2 McQuillen, Municipal Corporations § 10.35, at 830 (3d ed. rev. 1966); 37 Am.Jur. 819, Municipal Corporations § 182; 39 Tex.Jur.2d 610, Municipal Corporations § 280. Finally, if the record before us shows any one thing with clarity, it shows that the provisions *have not even been used* to try to achieve the unfair results or the injustices which the opinion says *is their purpose*. According to the testimony of the Company's own manager, of approximately 200 applications for permits since the ordinance was passed in 1949, not more than 30 have been denied; and according to the City Manager, not more than a "half-dozen" of the 30 denials were applications for customer service permits. And, while the Company's customer percentage had not kept pace with the City's in the ten-year period preceding trial in the rapidly growing City (14 to 15% at time of trial compared with 20% ten years before), its percentage of the revenue was 16–17%. According to the City's brief, undenied by the Company, Company's gross revenue increased from $53,000 in 1950, immediately after enactment of the ordinance, to $770,-000 in 1965. It thus appears that if these sections had the "purpose" attributed to them by the opinion, the purpose has failed miserably.

Pervading the majority opinion dealing with these sections is a basic philosophy that when a municipality puts in a public utility of its own, with a private utility franchise then outstanding or thereafter granted, the two enterprises must be permitted to enter into a dog-eat-dog, survival of the fittest competition for customers, with the prize of survival going to the one with the greater resources and ability to absorb losses for a longer period of time. In my opinion, the philosophy is unsound. It was condemned long ago by the United States Court of Appeals, 5th Circuit, in City of Seymour v. Texas Electric Service Co., 5 Cir., 66 F.2d 814 (1933). I am content to let the opinion, written by Judge Joseph C. Hutcheson, speak for me.

The opinion in *City of Seymour* characterizes the appeal as one for review of "a decree enjoining the enforcement of minimum rate ordinances passed by the city council to put an end to a destructive rate war which, begun by the municipal plant, was joined in with determined vigor by appellee." Texas Electric Service Company was operating under a franchise in Seymour, Texas, a city with not more than 650 potential electricity customers, when Fairbanks, Morse & Company induced the City to purchase on credit and install a municipal light and power plant, to be paid for out of revenues. Once the plant was installed, the City set its rates at a level 10 per cent lower than Texas Electric's rates, thereby inducing more than 50 per cent of Texas Electric's customers to sign contracts with the City. Texas Electric then reduced its rates 10 per cent below the City's rates, whereupon the city council enacted an ordinance establishing its rate level as the minimum rates which could be charged. Texas Electric charged in its suit for injunctive relief that "the city having installed a municipal plant in competition with appellee in a community where there are not enough users to sustain both, it is unreasonable and unjust to prevent appellee from using, in the competitive struggle for existence which the city has forced upon it, the effective weapon of rate cutting." There were other reasons urged for invalidating the ordinance, including, as here, a claim that the ordinance violated state and federal constitutional

provisions. At this point I quote from Judge Hutcheson's opinion at some length:

"The District Judge took appellee's view of it. He thought with Judge Bourquin, in Great Northern Utilities Co. v. Public Service Comm., 52 F.2d 802, since reversed 289 U.S. 130, 53 S.Ct. 546, 77 L.Ed. 1080, that having cried 'Lay on' the city could not by ordinance cry 'Hold—enough,' but must fight on to the bitter end.

"We do not think he was right. It must be admitted, however, that on its face there is much of poetic justice in the view the District Judge took. There is strong meat in the doctrine 'Who draws the sword shall perish by the sword,' and if the only untoward result of the controversy were to be that Fairbanks, saddled wtih the plant, would find itself hoist on its own petard, there might be no tears to shed. If, in short, this were only a private war between Fairbanks, Morse and the Texas Electric Company, the court might well stay the city from thrusting on Fairbanks' side. Such a view of the situation is, however, too much foreshortened. The larger, the truer view, though the prime combatants seem at times to have lost sight of it, is that there is a cause at stake, the cause of public service, the importance of which far transcends the failure or success in the lists of either champion. This cause it is the business and function of rate regulation to serve. Such regulation is intended to, it should, supplant wasteful competition.

"Though cities have no inherent power of rate regulation, and they must find it in statutes conferring the power, when it has been granted to them as it has been in Texas, they may exercise it fully. [Authorities cited].

"Viewing the matter in this light, we think it cannot be gainsaid that it was not only the right, but the duty of the council to put a stop to the contest before its ruthlessness had ruined one or both of the plants. We think, too, that in doing so, on the basis of fixing the same minimum for each plant, it acted justly and well within its powers. [Authorities cited].

"The ordinances under attack here have no function, no effect, but to prevent lethal rate cutting. They leave appellee free, except as bound by the statute of Texas to do no injustice, to fix its own rates at such figure above the minimum as it may desire."

To the same effect, see City of Farmersville v. Texas-Louisiana Power Co., 55 S.W.2d 195 (Tex.Civ.App.—Dallas 1932), reversed on other grounds, Texas-Louisiana Power Co. v. City of Farmersville, 67 S.W.2d 235 (Tex. Comm'n App.1933); Mapleton v. Iowa Public Service Co., 209 Iowa 400, 223 N.W. 476, 68 A.L.R. 993 (1929); Economic Gas Co. v. City of Los Angeles, 168 Cal. 448, 143 P. 717 (1914). In *City of Los Angeles,* the court said: "It is contended that the city's police power extends only to the protection of the consumer. But 'regulation' involves more than that. It includes the power to prevent ruinous competition among the producers as well as unjust charges to the consumers." And in Public Service Comm'n of Montana v. Great Northern Util. Co., 289 U.S. 130, 53 S.Ct. 546, 77 L.Ed. 1080 (1933), the Supreme Court of the United States held that an order of a public utilities commission fixing minimum rates to be charged by competing private utilities in a particular city, and thus putting an end to a destructive rate war, did not infringe constitutional rights of the combatants.

Judge Hutcheson's opinion in *City of Seymour* points out that courts in some jurisdictions, in cases cited, have upheld the power of a city to set a private utility's minimum rates at a higher level than those charged by a municipal plant in order to preserve the existence and stability of the municipal plant. "The reason for this," said Judge Hutcheson, "is not far to seek. It is, that though in owning and

operating a utility plant a city acts not in a governmental but in a proprietary capacity, when the council, exerting the power to regulate, comes to fix rates it represents not the city, as proprietor, but the state, as regulator. It exerts not the contractual power of the city, but the sovereign power of the state." So it is also when a municipality exercises its police power. See Kentucky-Tennessee Light & Power Co. v. City of Paris, 114 S.W.2d 815 (Tenn.1938).

The majority opinion does not notice *City of Seymour* or the other persuasive authorities cited by the City for its claim that a municipality may constitutionally exercise its police power to protect its municipally owned utilities from destructive competition, although by quoting from State v. Lone Star Gas Co., 86 S.W.2d 484 (Tex.Civ.App.1935, writ ref'd), it recognizes that "The right óf a state to regulate *the rates and practices* of a public utility is referable to the police power of the state, * * * which cannot be alienated or contracted away by * * * any * * * political sub-division of the state." If the quoted statement means anything, it means that a city cannot by franchise contract away its right to regulate the practices of a utility which under *City of Seymour* would destroy or impair the stability of a municipal utility. The rule in this State is that the power to regulate rates of public utilities belongs to the sovereign (the state), and can only be exercised by a political subdivision when expressly delegated, Texas-Louisiana Power Co. v. City of Farmersville, 67 S.W.2d 235 (Tex. Comm'n App.1933); but the police power is inherent in a political subdivision, as well as in the sovereign, and may be exercised by the political subdivision, as may the delegated power to fix rates, to promote the general welfare of its inhabitants. Thus the police power inherent in a municipality may be exercised to regulate activities of a private utility, as may the delegated power to fix rates, to protect

and preserve the stability of a municipal utility which, after all, is owned by the inhabitants of the municipality. *City of Seymour,* supra.

Cited in support of the majority position that the police power of a city may not be exercised to regulate the activities of a franchised utility for the purpose of protecting its municipally òwned utility from destructive competition, are Public Service Comm'n v. City of Paris, 299 S. W.2d 811 (Ky.1957); American Consumer Industries v. City of New York, 28 A.D.2d 38, 281 N.Y.S.2d 467; City of Akron v. Public Utilities Comm'n, 149 Ohio 347, 78 N.E.2d 890; Eighth Ave. Coach Corp. v. City of New York, 170 Misc. 243, 10 N.Y.S.2d 170; Wisconsin Tel. Co. v. City of Milwaukee, 223 Wis. 251, 270 N.W. 336. To me, the cited cases are neither apposite nor persuasive.

In *City of Paris,* acting under a constitutionally granted power of initiative and referendum, the inhabitants of the city directed the sale of a franchise to a private utility to compete with a municipally owned utility. The private utility obtained, after hearing, a statutory certificate of convenience and necessity from the state Public Service Commission. The city filed suit to set aside the commission's order on the ground that granting of the certificate would result in "unnecessary duplication of facilities and undesirable competition," and the company filed suit for a mandatory injunction directing the city to offer the franchise for sale. The court directed that the franchise be offered for sale, stating that it was "concerned only with the law applicable to the facts of this case" inasmuch as the public policy question had been settled by the legislative body (the people) by the referendum vote. Significantly, the court also stated, "We do not intend to imply that the question of competition should never be considered by the commission" in deciding whether to issue a certificate of convenience and necessity.

In *American Consumer's Industries,* the appellate division of a Supreme Court of New York struck down, as exceeding the city's police power, an *exclusive* franchise granted by the Commissioner of Markets to an ice dealer to sell ice to tenants of a municipal market. While I do not necessarily agree with this intermediate court opinion, this court also has stricken down certain types of *exclusive* franchises. See City of Brenham v. Brenham Water Co., 67 Tex. 542, 4 S.W. 143 (1887). No exclusive franchise is involved in this case. In *City of Akron,* the Supreme Court of Ohio upheld, over objection by the city, a temporary emergency order of the State Public Utilities Commission suspending certain franchise obligations of a private utility to furnish gas to city consumers. The holding was that the city's proprietary contract was subservient to the state's police power. In *Eighth Ave. Coach Corp.,* a New York Supreme Court held that the city, which had granted a franchise to a bus company to operate its buses over certain streets, could not in the exercise of its police power convert one of the streets into a one-way street since such action would cause loss of customers and revenue. In this enlightened day, I doubt seriously that a majority of this court would approve that decision. Contrast our decision in City of San Antonio v. Pigeonhole Parking of Texas, 158 Tex. 318, 311 S.W.2d 218, 73 A.L.R.2d 640 (1958). In *City of Milwaukee,* the Supreme Court of Wisconsin held an ordinance invalid which required a utility, opening up the pavement in a street to lay underground lines, to pay unpaid paving assessments against abutting lot owners. The court held the ordinance exceeded the city's police power and, also, that the required payment was for a private rather than a public purpose.

The majority's statement that the City had not urged that "duplication" embraced avoidance of ruinous or cut throat competition prior to its motion for rehearing is clearly in error. While not using those precise words, the City urged at several places in its supplemental brief, filed on original submission, that the purpose of the provisions which authorized it to prevent duplication was to protect its investment. It stated: "The question is whether this broad power [police power] may be used *to protect a city's investment* in a municipal power system"; again, "A city has the right to utilize its broad powers to regulate and control the use of its streets *so as to protect the investment of its citizens in its municipal system"*; and again, "It is true, however, that the permit in issue in this litigation was denied *for the purpose of preventing competition from TP&L* with respect to this particular apartment complex * * *. The City has a substantial investment in the facilities it installed to serve this property, and TP & L's application for a permit was denied *to protect that investment."* In its reply to the Company's application for writ of error, the City stated: "The electric revenue which would be lost to the City and its investment in the Walnut Street line if the permit had been granted would be about $1,000 a month, approximately 50 times the $20–$25 average monthly revenue received from the single family house lying to the north of Walnut Street." A good reason why the City did not express its views on this subject in more vigorous language on original submission is that it did not know and had no reason to suspect, on the record made at that time, that this court would pick out certain sections to void *if the sections* spoke of protecting the City from loss of customers, loss of revenue and the financial soundness of its bonds.

I cannot determine from the opinion whether the majority has held that the action of the City Council in denying the particular permit in issue in this case was arbitrary and unreasonable. Logically, having held section (b) invalid for lack of standards, validity of the Council's administrative action would not be reached. On the other hand, there is much in the majority opinion indicating that the ques-

tion is in fact reached and decided in favor of the Company. The opinion on original submission refers at two places to the memorandum prepared by the City Manager, which can have no relevancy to ordinance validity. There is also in the opinion a detailed statement of many facts which are relevant only to the issue of the validity of the Council's administrative action. Finally, the opinion contains this statement: "From an examination of the physical circumstances, we conclude the trial court correctly ruled 'that the refusal of the defendants to grant plaintiff a permit * * * is without basis or foundation in law or in fact'." If the statement has any relevancy, it would seem to bear only on validity of the Council's administrative action. All efforts on my part to obtain clarification have been unavailing; and, accordingly, it becomes necessary to devote at least a brief space in this opinion to the issue of arbitrary and unreasonable administrative action on the assumption that the Council's action in denying the particular permit has been held invalid for that reason.

The standards contained in section 10 (b) being, in my opinion, sufficiently definite to govern adimministrative discretion, there can be little, if any, question of the reasonableness of the City Council's action in denying the particular permit. The "area" in which the permit was sought is immediately south of Walnut Street, which runs easterly. Forest Lane is south of and parallel to Walnut Street. According to the map in the record, there is a considerable distance between the two streets. They are intersected by International Road, running northerly and southerly, at an approximate right angle. The Company had installed a line along the boundary of Forest Lane. In 1955, the City installed a line along the southern boundary of Walnut Street. The two lines thus paralleled each other, but each was installed to serve separate "areas". In 1957, the Company was granted a permit to extend its line northerly along In-

ternational Road to serve customers on that street, but this line dead-ended some 1,500 feet south of the Chiles and Stockton apartments which were constructed on the south side of Walnut Street. The City's Walnut Street line was so located, with reference to the apartments, that service could be furnished by simply dropping a service line. The Company, on the other hand, could not serve the apartments except by leaving the "area" in which its line was installed and by building a new line northerly for a distance of 1,500 feet into the "area", and to the very place, where the City's line had been installed since 1955. The City was already serving a developed area of private dwellings on the north side of Walnut Street and an apartment house on the south side of Walnut and immediately west of the Chiles and Stockton apartments. The average monthly revenue to the City from each of the private dwellings was $20–$25 per month, and the expected revenue from the Chiles and Stockton apartments was $1,000 per month. Granting of the permit would have enabled the Company to "pick off" a single heavy-load customer from an "area" in which the City's facilities were installed, and thus, would have resulted in "duplication" of service in the "area".

Once we accept as sound, as I do, the test laid down for determining "area" by the Supreme Court of the United States in *Hardin,* supra,—consideration of economic and engineering factors—it would seem crystal clear that the Council's action in denying the particular permit is reasonably supported by substantial evidence and was not arbitrary and unreasonable.

In my opinion, the conclusions reached by the majority in this case are based upon an erroneous treatment of the 1949 ordinance as an ouster ordinance rather than as a regulatory permit ordinance. My opinion, in this respect, finds support in citation by the majority of such cases as City of Tukwila v. City of Seattle, 68 Wash.2d 811, 414 P.2d 597, and City of Baird v. West Texas Uilities Co., 174 S.W.2d 649

(Tex.Civ.App.1943, writ ref.), in each of which the problem was one of complete ouster of the franchised utility from the city or from a substantial portion of it. The Garland ordinance does neither. The validity of the Garland ordinance can be sustained and the Company's vested franchise rights can still be protected. If the City Council acts arbitrarily in denying a particular permit, the Company can get the permit by establishing that fact in court. And, if the City uses the permit authority conferred by the ordinance as a cloak for a policy of discrimination against the Company, the Company, by satisfactory proof of that fact, can have the ordinance judicially invalidated. This suit is not based upon a claim of that character.

I would affirm the judgment of the court of civil appeals.

STEAKLEY, J., joins in this dissent.

On Motion for Rehearing

POPE, Justice.

■ City, in its motion for rehearing, concedes, arguendo that Section 10(b) of its ordinance may contain inadequate standards as we have held. It urges, however, that we should excise the words "contemplated or planned," under the severability clause of the ordinance, and thus save the section. In our opinion this would amount to such a change in the purpose manifested by Section 10(b) of the ordinance as to constitute new legislation on our part.

We must bear in mind that the City has already granted a franchise, and that City is now seeking by force of its police power to limit that franchise. We have held that a City may exercise its police powers. We have further held that the ordinance is indefinite in its use of the terms "area" and "duplication". The ordinance gives us no guide or help as to the meaning of those terms. City urges

that the term "duplication" embraces the avoidance of ruinous or cut-throat competition. Certainly the ordinance in all its provisions, and the City's briefs and contention, prior to its motion for rehearing included no such suggestion of a standard. Moreover, the record, in fact, shows that City has eighty-six per cent of the customers and receives eighty-three per cent of the revenue from the customers in Garland.

■ In our original opinion, we quoted briefly from City of Tukwila v. City of Seattle, 68 Wash.2d 811, 414 P.2d 597 (1966). We said that Sections b, e and k did not state a reasonable standard aimed at protecting the safety or welfare of the public. It was not intended to limit a City's exercise of police powers to those factors only, and of course, police powers extend to the reasonable protection of the public health, safety, morals or welfare. City of Tukwila, however, well illustrates the point in question. In that case, the City sought to avoid duplication and to cut down upon franchise powers it had previously granted by resort to public safety as the basis for the exercise of police power. It was in that context, that the court wrote to explain why some safety standard needed to be included in the ordinance:

"This case, however, does not involve legislation designed to increase the safety factors or limit the dangers. It does not involve an electrical safety code, nor prescribe minimal standards for equipment, construction and safety devices but, instead prohibits the exercise of the franchise in a substantial area of the franchise territory. It prohibits rather than protects. * * *."

We should have quoted instead of merely citing Mr. Justice Brennan's opinion in Weiner v. Borough of Stratford, 15 N.J. 295, 104 A.2d 659 (1954). In that case, the Borough conditioned the grant of a business license upon compliance by the licensee with safety laws and ordinances,

but otherwise imposed no standard for the exercise of discretion. The court recognized, as we do, that a city may enact policing ordinances for the protection of the public health, safety, morals, and welfare; but struck down the ordinance in question, holding:

"* * * However, unless the provisions of a licensing and regulatory ordinance vesting discretion in licensing officials to grant or deny a license provide adequate standards to govern the deliberations of the officials having the discretionary power, the provisions must be struck down as utterly void. * * *"

The term "area" is equally indefinite. It could mean the entire city. In Davis v. City of Lubbock, 160 Tex. 38, 326 S.W.2d 699, 713–715 (1959), this court discussed the legislative standards set for the terms "slum area" and "blighted area". The emphasis of the legislation was, of course, upon the condition; but the terms were attacked as too vague. This court held they were not too vague because the area could be identified by conditions which were clearly stated in Section 4 of Article 12691–3. Vern.Tex.Civ.Stats. Davis v. City of Lubbock carefully points out the several legislative standards included in the statute.

The term "area" is discussed in Hardin v. Kentucky Utilities Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed. 787 (1968). The Supreme Court did not discuss the validity of the statute which used the term, since the statute had stated a standard in the context of the purpose of the legislation and the question was apparently not raised. The term "area" was used in the 1959 Tennessee Valley Authority Act. 16 U.S.C. § 831n–4(a). In limiting the territory which TVA could serve, the Act stated a standard for the term "area". Section 831n–4 in part provides:

"* * * the Corporation [Tennessee Valley Authority] shall make no contracts for the sale or delivery of power which would have the effect of making the Corporation or its distributors, directly or indirectly, a source of power supply outside *the area for which the Corporation or its distributors were the primary source of power supply on July 1, 1957, and such additional area extending not more than five miles around the periphery of such area as may be necessary to care for the growth of the Corporation and its distributors within said area:* (Emphasis added)

"* * *

"Nothing in this subsection shall prevent the Corporation or its distributors from supplying electric power to any customer within *any area in which the Corporation or its distributors had generally established electric service on July 1, 1957, and to which electric service was not being supplied from any other source on the effective date of this Act.* (Emphasis added)

The rights of one who has been granted a franchise and the limitations upon the power to impair those contractual rights are further discussed in City of Baird v. West Texas Utilities Co., 174 S.W.2d 649 (Tex.Civ.App.1943, writ ref.); Alabama Power Co. v. City of Guntersville, 236 Ala. 503, 183 So. 396, 119 A.L.R. 429 (1938); Tacoma v. Boutelle, 61 Wash. 434, 112 P. 661, 665 (1911); 1 Pond, Public Utilities, Sec. 119, p. 292 (1932).

City of Garland's motion correctly states that we were in error in our statement that the Company relied upon Mayor of City of Houston v. Houston City St. Ry. Co., 83 Tex. 548, 19 S.W. 127 (1892), and Article 1, Section 19 of the Texas Constitution. The City cited us to the case and the case discussed Article 1, Section 19, Texas Constitution.

The motion for rehearing is overruled.

CALVERT, C. J., dissenting joined by STEAKLEY, J.